# **EXHIBIT 1**

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                     )
ROBERT GUSTAVSEN, JOSEPH CUGINI,     )
DEMETRA COHEN, LEE WILBURN,          )
JACKIE CORBIN, MARY LAW              )
and CECELIA BRATHWAITE,              )
on behalf of themselves and         )
all others similarly situated,      )
                                     )
          Plaintiffs,                )
                                     )        Civil Action
v.                                   )        No. 14-CV-11961-MLW
                                     )
ALCON LABORATORIES, INC.;            )
ALCON RESEARCH, LTD.; FALCON         )
PHARMACEUTICALS, LTD.; SANDOZ,       )
INC.; ALLERGAN, INC.; ALLERGAN       )
USA, INC.; ALLERGAN SALES, LLC;      )
PFIZER INC.; VALEANT                 )
PHARMACEUTICALS INTERNATIONAL,       )
INC.; BAUSCH AND LOMB                )
INCORPORATED; ATON PHARMA, INC.;     )
MERCK & CO., INC.; MERCK,            )
SHARP & DOHME CORP.; PRASCO,         )
LLC; AND AKORN, INC.,                )
                                     )
          Defendants.                )
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

MOTION HEARING
October 30, 2015

John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    For the Plaintiffs:
      Kenneth J. DeMoura, Esq.
 3    DeMoura Smith LLP
      One International Place
 4    14th Floor
      Boston, MA 02110
 5    617-535-7531
      kdemoura@demourasmith.com
 6
      Emily L. Perini, Esq.
 7    Perini-Hegarty & Associates, P.C.
      225 Franklin Street, 26th Floor
 8    Boston, MA 02110
      617-217-2832
 9    elp@perinihegartypc.com

10    Richard S. Cornfeld, Esq.
      Law Office of Richard S. Cornfeld
11    1010 Market Street
      Suite 1720
12    St. Louis, MO 63101
      (314) 241-5799
13    rcornfeld@cornfeldlegal.com

14    For Defendants Sandoz Inc., Alcon Laboratories, Alcon Research,
      Falcon Ltd.:
15    Christiana C. Jacxsens, Esq.
      David G. Thomas, Esq.
16    Greenberg Taurig, LLP
      3333 Piedmont Road
17    Suite 2500
      Atlanta, GA 30305
18    678-553-2105
      jacxsensc@gtlaw.com
19
      For Defendants Allergan entities:
20    James P. Muehlberger, Esq.
      Shook, Hardy & Bacon LLP
21    2555 Grand Boulevard
      Kansas City, MO 64108
22    816-421-5547
      jmuehlberger@shb.com
23

24    (continued on next page)

25
```

```
 1    APPEARANCES:  (Cont.)

 2    For Defendant Pfizer:
      Robyn E. Bladow, Esq.
 3    Shaun Paisley, Esq.
      Kirkland & Ellis LLP
 4    333 South Hope Street
      Los Angeles, CA 90071
 5    231-680-8400
      robyn.bladow@kirkland.com
 6    shaun.paisley@kirkland.com

 7    David S. Clancy, Esq.
      Skadden, Arps, Slate, Meagher & Flom LLP
 8    500 Boylston Street
      Boston, MA 02116
 9    617-573-4800
      david.clancy@skadden.com
10
      For Defendant Valeant Pharmaceuticals, Inc.:
11    David B. Chaffin, Esq.
      White and Williams LLP
12    99 Summer Street
      Suite 1530
13    Boston, MA 02110
      617-748-5200
14    chaffind@whiteandwilliams.com

15    For Defendants Merck & Co., Inc., Merck Sharp & Dohme Corp.
      and Prasco, LLC:
16    Stephen G. Strauss, Esq.
      Randy J. Soriano, Esq.
17    Bryan Cave LLP
      211 North Broadway
18    Suite 3600
      St. Louis, MO 63102
19    314-259-2000
      rjsoriano@bryancave.com
20    sgstrauss@bryancave.com

21    Amy Cashore Mariani
      Fitzhugh & Mariani LLP
22    155 Federal Street
      Suite 1700
23    Boston, MA 02110
      617-695-2330
24    amariani@fitzhughlaw.com

25    (continued on next page)
```

```
1    APPEARANCES: (Cont.)

2    For Defendant Akorn, Inc.:
     John M. Kilroy, Esq.
3    Polsinelli PC
     900 West 48th Place
4    Suite 900
     Kansas City, MO 02199
5    816-753-1000
     jkilroyjr@polsinelli.com
6
     Joseph P. Crimmins, Esq.
7    Posternak, Blankstein & Lund
     Prudential Tower
8    800 Boylston Street
     Boston, MA 02199-8004
9    617-973-6273
     jcrimmins@pbl.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
              1              P R O C E E D I N G S
              2              (The following proceedings were held in open court
              3      before the Honorable Mark L. Wolf, United States
              4      District Judge, United States District Court, District of
              5      Massachusetts, at the John J. Moakley United States Courthouse,
              6      One Courthouse Way, Courtroom 10, Boston, Massachusetts, on
              7      Friday, October 30, 2015.)
              8              THE COURT:  Would counsel please identify themselves
              9      for the Court and for the record.
02:58        10              MR. DeMOURA:  Good afternoon, your Honor.  Kenneth
             11      DeMoura from DeMoura Smith for the plaintiffs.
             12              MR. CORNFELD:  And Rick Cornfeld.  I'm from St. Louis,
             13      and I represent the plaintiffs.
             14              MS. PERINI:  Emily Perini, Perini-Hegarty &
             15      Associates, for the plaintiffs.
             16              MR. STRAUSS:  Good afternoon, your Honor.  Steve
             17      Strauss, Randy Soriano and Amy Mariani for defendants Merck and
             18      Prasco.
             19              MS. JACXSENS:  Your Honor, Christiana Jacxens,
02:58        20      Greenberg Traurig, along with my colleague Dave Thomas for
             21      defendants Sandoz, Inc., Alcon Laboratories, Alcon Research and
             22      Falcon.
             23              MS. BLADOW:  Good afternoon, your Honor.  Robin Bladow
             24      for Pfizer.  With me for Pfizer is Sean Paisley and Dave
             25      Clancy.
```

```
 1              MR. MUEHLBERGER:  Good afternoon, your Honor.  James

 2     Muehlberger appearing on behalf of Allergan, Aton Pharma,

 3     Bausch and Lomb and Valeant.

 4              THE COURT:  Who else?

 5              MR. KILROY:  John M. Kilroy, Jr., on behalf of Akorn,

 6     and Joseph Crimmins also on behalf of Akorn.

 7              THE COURT:  Okay.  If you're not within the enclosure,

 8     I assume you're not going to be speaking, so I think I've got

 9     enough of you to try to keep straight.

10              I apologize both for the time it has taken to schedule

11     this hearing and for my starting almost a half hour late.

12     There are many motions on behalf of many defendants, and it's

13     always my goal to decide them orally at the hearing, which is

14     my goal today.  We'll see whether it's going to be achieved.

15     But it took me somewhat longer to prepare, finish preparing

16     than I had hoped.

17              So we're here today with regard to the defendants'

18     motion to dismiss.  Which of you represent the generic

19     drugmakers?

20              MS. JACXSENS:  There are several of us, your Honor.  I

21     represent Sandoz and Falcon, who are both generic drug

22     manufacturers.

23              THE COURT:  I'm going to hear the motions to dismiss

24     of the other defendants first.  I think it may be useful to

25     recognize the applicable standards.  The generally applicable
```

1    standard on a motion to dismiss is that such a motion should be

2    denied if the plaintiff has shown a plausible entitlement to

3    relief.  The complaint must contain sufficient factual matters

4    accepted as true to state a claim that is plausible on its

5    face.  The complaint needs to be construed liberally.  It has

6    to be specific enough to permit the reasonable inference that

7    the plaintiffs stated a plausible claim.

8         Under Rule 12(b)(6), the District Court may properly

9    consider only facts and documents that are part of or

03:01 10  incorporated into the complaint.  That's *Rivera*, 575 F.3d 10,

11   15.  However, there are narrow exceptions for documents the

12   authenticity of which are not disputed by the parties; for

13   official public records; for documents central to plaintiffs'

14   claim; or for documents sufficiently referred to in the

15   complaint.  That's *Watterson*, 987 F.2d at 3, 4.

16        When I'm deciding a 12(b)(1) motion, alleging subject

17   matter -- alleging lack of subject matter jurisdiction, I also

18   have to construe the complaint liberally and treat all well-

19   pleaded facts as true, giving the plaintiff the benefit of all

03:02 20  reasonable inferences, but I don't have to accept as true legal

21   conclusions couched as factual allegations.  I think

22   importantly -- and we can go over this again because I'm going

23   to segment the argument.

24        With regard to the preemption argument, preemption as

25   I understand it is an affirmative defense.  And a leading First

```
 1    Circuit case on when an affirmative defense is sufficient to
 2    justify granting a motion to dismiss is *Blackstone Realty*, 244
 3    F.3d 193.  The First Circuit wrote that the facts establishing
 4    the defense must be clear on the face of plaintiff's pleadings.
 5    Furthermore, review of the complaint together with any other
 6    documents appropriately considered under Rule 12(b)(6) must
 7    leave no doubt that the plaintiff's action is barred by the
 8    certain defense.
 9            So that's the legal framework I start with.  If you
03:03 10    think it's not accurate or complete in every relevant regard,
11    you can tell me.
12            The threshold question is whether the plaintiffs have
13    standing.  It's my present view that they have adequately
14    alleged standing for the purpose of the motion to dismiss.
15    That is, standing based on economic injury in fact.  I don't
16    know if the -- it didn't appear to me the plaintiffs were
17    seeking to establish standing based on a claim of physical
18    injury, but maybe that could get clarified.
19            MR. CORNFELD:  Your Honor, Rick Cornfeld --
03:04 20            THE COURT:  Excuse me.  If you address the Court in
21    this District, you stand up.
22            MR. CORNFELD:  I apologize, your Honor.  Rick Cornfeld
23    for the plaintiffs.  That is correct.  The plaintiffs are not
24    seeking damages for physical injury.
25            THE COURT:  Okay.  Then for reasons I could explain,
```

1   it's my present view that standing is adequately alleged.  If

2   the defendants want to be heard on that, I'll hear you, but I'm

3   hoping to have the major argument focused on the preemption

4   matter.  Would the defendants, any or all of them, like to

5   address standing?

6             MS. BLADOW:  Yes, your Honor.

7             THE COURT:  And if you don't mind -- and even if you

8   do mind -- please remind me who you are.

9             MS. BLADOW:  Absolutely, your Honor.  Robin Bladow for

03:05 10  Pfizer.  We would like to address standing.  What we've done,

11  just to make things clear, there's a lot of lawyers here, we've

12  divided the argument up based on topic.

13            THE COURT:  Okay.

14            MS. BLADOW:  So you get the best prepared person,

15  hopefully, to respond to each of the issues.  If your Honor

16  does want to give us some indication of why you believe there,

17  in fact, is standing, because we believe very strongly that

18  there isn't.

19            THE COURT:  In fact, I usually do.  As I understand

03:06 20  it, the plaintiffs allege that the eyedrops at issue here or

21  the droppers dispense more than necessary and more medication

22  than the eye can absorb and they do that so consumers will have

23  to buy more, spend more, and the defendant companies will make

24  more money.  They allege that there are scientific studies that

25  support their theory, and they quote one of the Akorn

1    executives saying that that is the motive for having 30 or 45

2    microliters dispensed rather than the 15 that they say the

3    studies show is efficacious.

4         I think I can consider those materials because they're

5    referenced in the complaint.  Count 1 alleges a violation of

6    Mass. General Law Chapter 93A.  And Chapter 93A prohibits

7    unfair and deceptive practices.  It's very broadly interpreted

8    by the Massachusetts courts.  Anything that's in the penumbra

9    of established legal theory can be deceptive or unfair.

03:08 10        So it appears to me, at the moment, without giving you

11   all the details, that they've adequately alleged a Chapter 93A

12   claim and as well the elements for standing based on economic

13   injury.  They essentially allege that they paid more for the

14   prescription eye medicine than they should have.  They

15   overpaid, and the defendants profited.

16        So, to me, that is not an implausible claim generally,

17   and they actually cite the statement of one of the defendants

18   from Alcon, that that was a motive.  So that's a compressed

19   version of my present reasoning, tentative reasoning.

03:09 20        MS. BLADOW:  Thank you, your Honor.  I appreciate that

21   there's a lot of paper before your Honor and there's a lot of

22   cases that we cited.  I hope your Honor had an opportunity to

23   review the *Cottrell* opinion for the District of New Jersey,

24   Judge Wolfson's opinion.

25        THE COURT:  I did read it, but it doesn't state the

1    standard under Chapter 93A.  If he accurately understood the

2    law in the Third Circuit, it's not the law in Massachusetts.

3         MS. BLADOW:  Well, the decision was based on Article

4    III, and injury in fact you must show under Article III.  What

5    we have here, and I think what I urge your Honor to consider,

6    is the fact that under a 93A or under any consumer protection

7    statute or any type of unfair businesses claim, the claim is

8    generally, Okay.  I bought a product, and I spent ten dollars

9    on that product, but I didn't get what was represented to me.

03:10 10   I didn't get my ten dollars' worth.  I only got seven dollars'

11   worth.  You told me it was going to do X, Y and Z.  It only did

12   X and Y, so I get my three dollars back because it didn't

13   perform Z.  That's one way.  That's not what plaintiffs are

14   alleging here.

15        The other situation might be where you purchase a

16   product and you pay your ten dollars for it, and then you're

17   harmed in some way; the product caused you illness, it caused

18   physical harm.  That's another way that you might be injured.

19   But the injury that's alleged here is injury I have not seen in

03:10 20   any other case, and I believe that your Honor would be the

21   first to permit it to go forward under Article III.  And here

22   is why.

23        THE COURT:  It wouldn't be the first time that I was

24   the first judge to do something.  I was the first judge to

25   order the FBI to disclose the existence of a high echelon Mafia

1    informant, and now it's a major motion picture.

2          MS. BLADOW:  But let me explain to your Honor why I

3    think that would be a grave mistake here.  The plaintiffs went

4    in and they purchased a product and they got exactly what was

5    represented to them and exactly what they paid for.  There's no

6    harm.  They got the doses they needed.  They got effective

7    medication.

8          THE COURT:  They're saying they got three times or two

9    times the dose.

03:11 10          MS. BLADOW:  But they got what they were promised, and

11   they got what they paid for.  The fact they got more is not

12   injury to them.  There's no harm.  Their entire theory is

13   premised on the notion that had there been less volume in the

14   bottle that the bottle necessarily would have cost less.  And

15   frankly, your Honor --

16          THE COURT:  Actually, I don't think they have to.

17   This is why I think the standard is very important.  You know,

18   you're honing in on just the right thing.  At this point I have

19   to decide whether they've alleged specific facts to state a

03:12 20   plausible claim.  And they allege, are going to argue -- they

21   do argue, as I understand it, that at least implicitly, the

22   medication would have cost less.  If they bought a bottle that

23   was half as big, it would have cost half as much.  That's not,

24   even without the Alcon statement, in my present view,

25   inherently, it's not implausible.  That's A.  And B, they

1    reference a statement of one defendant that's consistent with

2    that.

3         MS. BLADOW:  Well, but your Honor, it's not a

4    statement of fact.  You have to agree that it's not a statement

5    of fact.

6         THE COURT:  It could be.

7         MS. BLADOW:  That the medication would have cost less?

8    There's absolutely no requirement anywhere in the law, and

9    counsel hasn't cited any, that would require these companies to

03:13 10  charge less under the circumstances.

11        THE COURT:  Why is it obvious that it wouldn't cost

12   less?  In other words, we might develop the arguments, and

13   indeed, I don't think there could be an antitrust -- I'm being

14   somewhat -- I don't know how to say it.  This is competitive

15   industry.  Usually Pfizer and Merck compete.  They compete on

16   price.  They say we'll give you 15 microliters and ours will

17   last twice as long.  Doctors should prescribe Merck, not

18   Pfizer.

19        MS. BLADOW:  And it is a competitive industry, and the

03:13 20  market should regulate this exact thing that counsel is

21   raising.  The market should regulate this issue.  And the fact

22   of the matter is, if defendants are forced to go and research,

23   redesign, repackage, resubmit to the FDA these products with a

24   smaller tip, it's pure conjecture, it really is, under *Lujan v.*

25   *Defenders of Wildlife.*  This is Supreme Court Article III

1    authority.  It's pure conjecture that the price would be

2    different.  I would direct your Honor perhaps to the D.C.

3    Circuit case, the *United Airlines* case, and we cite in our

4    brief.  That's a situation where -- I don't know if your Honor

5    recalls it but --

6              THE COURT:  I recall it.  It's discount airline

7    tickets.

8              MS. BLADOW:  That's exactly what it is.  And the Court

9    said, Hold on a second.  If United Airlines wasn't permitted to

03:14 10   have these no-transfer constraints on these tickets, it would

11   require the Court to pile speculation atop speculation in order

12   to determine --

13             THE COURT:  Hold on a second.  Let me get that case.

14             MS. BLADOW:  Sorry about that.

15             THE COURT:  That's okay.  Two things.  That's

16   *Dominguez*, right?

17             MS. BLADOW:  Yes.

18             THE COURT:  It was decided on summary judgment, not on

19   a motion to dismiss.  Do you remember that?

03:14 20             MS. BLADOW:  It's still the same exact framework,

21   though.

22             THE COURT:  Of course it's not.  It depends on what

23   the evidence is.

24             MS. BLADOW:  Here there is no evidence, there's no

25   allegation that these defendants would in fact be required to

1 charge something --

2 THE COURT: I have to liberally construe the

3 allegations. They cite in a journal -- it might not be true.

4 When you get to summary judgment, the fellow might say I never

5 said it. Although you still have a disputed fact if it's

6 material. But you have an executive of one of these companies

7 saying, We don't want to make the dropper dispense smaller

8 drops because we want to make more money.

9 MS. BLADOW: I think we have a really hard time, and

03:15 10 I'm frankly a little bit surprised that your Honor is relying

11 on that statement from an unnamed executive at one of the

12 defendants. I represent Pfizer. It certainly doesn't say

13 anything that Pfizer has to do. It also doesn't say anything

14 about what the law requires companies to do in terms of

15 pricing. I mean, I just caution your Honor because what we

16 have here is a situation where you permit --

17 THE COURT: Here. Let me help you with this. You

18 showed me a D.C. Circuit case on summary judgment.

19 MS. BLADOW: Only to show that the defendants --

03:16 20 THE COURT: I understand.

21 MS. BLADOW: -- have discretion in their pricing.

22 THE COURT: What about -- maybe I can anticipate your

23 answer. Do you recall what the First Circuit said with regard

24 to standing analogous relevant to this in, *In Re:*

25 *Pharmaceutical Industry*, 582 F.3d --

1       MS. BLADOW:  I sure do, your Honor.  I think that's a

2   good case to point out because I know plaintiff has relied very

3   heavily on that case.  And in that case, it falls into the

4   category that I talked about earlier, which is, there is a

5   misrepresentation, there is an alleged misrepresentation in

6   that case that the drug companies were setting an average

7   wholesale price that was false.  And because that wholesale

8   price was false, third-party payors were paying out much higher

9   than they otherwise would.

03:16 10     That's not what happened here.  In fact, plaintiffs

11  don't even argue that they would not have bought the product

12  had they known about the drop size issue.  There's no

13  misrepresentation at all.  They went into these transactions,

14  purchased a product prescribed by their doctors, no less, but

15  purchased a product and got exactly what they paid for.

16      THE COURT:  Did anybody -- did any of the defendants

17  or anybody else offer the product with droppers that dispensed,

18  say, less than 30 microliters?

19      MS. BLADOW:  No.  There aren't droppers out there that

03:17 20  are made as counsel and plaintiffs have argued it should be

21  made.  Your Honor, this is -- it really is opening up a huge

22  can of worms, and I would really urge you to think about this

23  and reconsider at least your tentative --

24      THE COURT:  I have thought about it.

25      MS. BLADOW:  I understand you have.  But let me just

1     posit something for you.

2          I'm a consumer and I walk into the grocery store, and

3     I look at the ketchup bottle.  I decide that there's a better

4     way -- I have some science behind me even, there's a better way

5     to make a ketchup bottle so I can get all the ketchup out, or I

6     can get all the toothpaste squirted out of the toothpaste

7     container, or I have a can of hairspray that I think the

8     diameter is too big, it goes all over the place, it doesn't go

9     on my flat hair, and I think there's a better way to make the

03:18 10    product.  So I'm going to buy a ticket into Article III court

11    because I think there's a better way and I want 20 cents back

12    on my hairspray product because the diameter of the spray is

13    too big?  That can't be what standing is here, particularly

14    where there is no misrepresentation.  The consumers got exactly

15    what they paid for.  They weren't harmed by the product.

16          THE COURT:  I thought they were in effect arguing --

17    this is Chapter 93A.  Is it unfair?  Is it deceptive?  In

18    effect, I thought their argument was -- the way I was perhaps

19    construing it is -- the manufacturers, the drug companies are

03:18 20    saying, you know, you need this eyedrop.  It's been prescribed

21    for you, and you need at least this much, 30 microliters.  And

22    they say there's evidence that the body can't absorb that much.

23          But the motion to dismiss standard is very important.

24    That's why I started with it.  Let me hear from the plaintiffs,

25    and perhaps I'll give you a chance to respond.

          1           MS. BLADOW:  Okay.  Thank you, your Honor.

          2           MR. CORNFELD:  Your Honor, with all due respect, if

          3      you deny this motion, you won't be the first judge who has ever

          4      found standing in a similar situation, who has ever found

          5      standing for somebody who is complaining about an unfair

          6      practice or some other illegal practice with respect to a drug

          7      that they bought and provided exactly the treatment that they

          8      were seeking.

          9           That is what happened in the *Average Wholesale Price*

03:19  10      *Litigation*.  It was a claim of unfair practices.  In fact, we

          11      rely on what Judge Saris did, not with respect to standing, but

          12      she -- as you may recall, she ruled that a Massachusetts named

          13      plaintiff could represent plaintiffs in other states that had

          14      similar unfair or unconscionable practice statutes, showing

          15      that that was an unfair practice claim just like ours is.  The

          16      plaintiffs bought medication.  The medication so far as the

          17      record shows worked.  It didn't cause them any physical

          18      problems, just like us, but it cost them more money than it

          19      should have.

03:20  20           The other First Circuit case that found standing in a

          21      similar situation is the recent case of *In Re: Celexa*.  That

          22      was last January.  We just submitted that within the last week

          23      or so to your Honor.

          24           THE COURT:  Hold on a second.  We should have it.

          25           What's the citation on it, please?

1          MR. CORNFELD:  Just one moment.  I'm sorry, your

2     Honor.  I misspoke.  *In Re: Nexium*, 777 F.3d 9.

3          THE COURT:  What page?

4          MR. CORNFELD:  777 F.3d 9.  That was an antitrust case

5     where Nexium was accused of conspiring with generics to -- a

6     so-called pay for delay case, where they kept the generics off

7     the market.  At page 32 --

8          THE COURT:  Page 32?

9          MR. CORNFELD:  Yes.

03:22 10          THE COURT:  Let me find page 32.

11          MR. CORNFELD:  Okay.  Where the Court said, "It is

12     undisputed that the named plaintiffs have shown that they were

13     overcharged for at least one Nexium transaction during the

14     class period establishing standing."

15          THE COURT:  Hold on.

16          MR. CORNFELD:  Cited *Baker v. Carr*, then saying the

17     named plaintiffs thus have standing to sue for their injuries

18     and to request under Rule 23(b)(3) that the Court allow them to

19     represent and secure a judgment on behalf of the class.

03:22 20          In addition, a District Court case, *In Re: Solodyn*,

21     which was cited just last month.

22          THE COURT:  Did you cite that for me previously?

23          MR. CORNFELD:  We submitted that in the last couple of

24     weeks, and your Honor gave us grant of leave to today.

25          THE COURT:  Okay.  What page?

1      MR. CORNFELD:  On page star 14 -- your Honor, this is

2  another so-called pay for delay case.  And the Court states,

3  The Court concludes that the named end payors have Article III

4  standing.  It is undisputed that the end payors allege that

5  they paid for Solodyn at prices that were inflated due to

6  defendant's alleged anticompetitive actions, and such

7  allegations constitute a cognizable monetary injury.  It is

8  further undisputed that the remedy sought, compensatory and

9  injunctive relief for these overpayments, is likely to redress

03:23 10  this injury.

11      So whether there's a misrepresentation in a case where

12  the claim is unfair, an unfair practice, it's irrelevant for

13  standing.  Standing is whether the plaintiff was injured, and

14  we believe we have adequately alleged an economic injury and we

15  believe we have adequately alleged the basis for saying that

16  with a lot of literature.

17      THE COURT:  Well, all right.  I mean, I do think that

18  it's related to the 93A claim that you would have to be injured

19  by some actionable wrong, and these overlap.  If you have

03:24 20  standing, I don't expect I'm going to dismiss the 93A claim.

21  But keep going.

22      MR. CORNFELD:  Okay.  We have -- as your Honor pointed

23  out, we have literature in the complaint.  Judge Wolfson in the

24  *Cottrell* case gave us leave to amend, and we did amend that

25  complaint.  And we emphasized the specific literature where

 1    scientists have said, peer-reviewed literature undisputed in

 2    any publication, where they've said that if the drops were

 3    smaller, prices would be lower.

 4         THE COURT:  So actually, let me -- you're in the

 5    *Cottrell* case, too?

 6         MR. CORNFELD:  Yes, yes, your Honor.

 7         THE COURT:  That's another eyedrop case?

 8         MR. CORNFELD:  It's actually the exact same factual

 9    claim but involving different states, involving other states.

03:25 10        THE COURT:  Why shouldn't there be one case, or why

11    shouldn't these cases be consolidated?

12         MR. CORNFELD:  For example, convening in MDL, nobody's

13    asked for an MDL in any of the cases your Honor.

14         THE COURT:  But here you didn't just bring a case -- I

15    mean, this is a digression, but it has some practical

16    significance.  You don't bring your claim just under

17    Massachusetts law.  You bring it under the law of many states,

18    other states.

19         MR. CORNFELD:  Yes, your Honor.

03:26 20        THE COURT:  Could those claims have been brought in

21    New Jersey?

22         MR. CORNFELD:  Actually, the first case was brought in

23    the Southern District of Illinois.  There are three cases in

24    the United States now.  And could we have combined them all?  I

25    don't see a reason why we couldn't have, your Honor.  Nobody --

```
 1    all of these, except for Akorn, which is a defendant here and
 2    is not a defendant in the Southern District of Illinois, all of
 3    the parties are the same in all three cases.
 4              THE COURT:  Many of you have children you want to put
 5    through college.
 6              MR. CORNFELD:  I would like to have these cases
 7    resolved as soon as possible, actually, your Honor.
 8              THE COURT:  So would they.  They'd like to dismiss
 9    them.
10              MR. CORNFELD:  Anyway, I understand what you're
11    saying.  The first case was in the Southern District of
12    Illinois.  I don't know where -- if somebody asked for an MDL,
13    if the MDL panel would convene one and where it would go.
14              THE COURT:  But is there more you'd like to say on
15    standing?
16              MR. CORNFELD:  No.  I mean, I have the literature that
17    we cited that shows -- I could show it to you here if you're
18    interested, but it's just literature, one paper after another.
19              THE COURT:  The literature shows --
20              MR. CORNFELD:  That -- excuse me.  I'm sorry, your
21    Honor.
22              THE COURT:  Go ahead.  I'm familiar with the
23    allegations of the complaint.
24              MR. CORNFELD:  It supports our allegations.
25              THE COURT:  Why don't you repeat them.
```

03:26 (line 10)
03:27 (line 20)

1          MR. CORNFELD:  Okay.  If the drops had been smaller,

2     then the cost would be less for patients.

3          THE COURT:  But basically you're saying the literature

4     shows that anything over 15 or 16 microliters has no medicinal

5     value.  Lots of it doesn't even get into the body because it

6     can't be absorbed.  And if that's all you had, it would be a

7     reasonable inference to conclude for motion to dismiss purposes

8     that they're designing their droppers to dispense twice as much

9     so they can get people to buy twice as much as they really

03:28 10   need, but you have something else, too.  You have a reported

11    statement from an executive of one of the defendants saying,

12    Yes, that's our motive.

13         MR. CORNFELD:  That's correct, your Honor; that is

14    correct.  We have literature that supports both points, that

15    anything above 15 or 16 microliters is wasted, doesn't provide

16    any benefit, and literature that says -- including by these

17    companies but also by independent people, that says if the

18    drops were smaller, the cost to patients would be less.  And we

19    have the statement by Alcon's executives.

03:29 20        THE COURT:  I bet you'd like to respond to this.

21         MS. BLADOW:  If you don't mind, your Honor.

22         THE COURT:  That's okay.  You've been waiting a long

23    time.

24         MS. BLADOW:  I really would like to respond because I

25    do think the Article III issue is a critical one here and

1   obviously always one that's critical for any Article III court.

2          THE COURT:  I write that and say that often.

3   Basically if I don't have jurisdiction or they don't have

4   standing, there's no case or controversy.  That's a

5   constitutional issue.

6          MS. BLADOW:  Absolutely, your Honor, and it's one that

7   should not be taken lightly, and it's one that should not

8   require any stretches, any conjecture, any hypothetical

9   situation.  But that's what we have here.

03:29 10          I'll start with the Alcon statement and the literature

11   that Mr. Cornfeld is talking about.  There's nothing he can

12   cite to, your Honor, that says that these defendants are

13   required or intend to make more money by having larger drop

14   volumes or are required to charge less for a bottle that

15   contains less liquid.

16          I mean, you know, you have to think of the big picture

17   here.  Particularly after -- these companies have been making

18   these drops for years.  They're all FDA approved.  They went

19   through the process already of spending a lot of time and money

03:30 20   to put these products out on the market.  And now the

21   assumption is or quote, unquote, "reasonable inference" that

22   your Honor is suggesting you might draw is that just because

23   one employee at one of the defendants said that this might be a

24   motive?  I mean, that says nothing about --

25          THE COURT:  When I rule on this, you'll hear what I

1    say, and that's not what I said.  I said it would be a

2    reasonable inference even if you didn't have that statement but

3    that statement is fairly powerful.  And of course standing can

4    be reviewed at summary judgment.  If there are disputed

5    material facts, they can be decided at trial.

6         MS. BLADOW:  Absolutely, your Honor, and I agree with

7    that.  And I certainly believe that if your Honor rules against

8    the defendants we would re-raise it as soon as we can because I

9    think it would be a mistake.

03:31 10         On the *Nexium* and the *Solodyn* cases, those are

11   antitrust cases.  Those are cases where there was, by

12   definition, based on the claim, an artificially inflated price.

13   So that's how they got to the artificially inflated price that

14   actually showed injury in those claims.  Here we don't have

15   that.  I mean, here, even if your Honor is inclined to look at

16   the 93A claim --

17         THE COURT:  Of course I'm inclined to look at it.

18   They made a claim.

19         MS. BLADOW:  You have a -- I mean whether or not

03:31 20   plaintiffs have specifically adequately alleged that claim.

21   You have a situation where this product -- you can't possibly

22   determine that a product, putting a product out on the market

23   that has been FDA approved is an unfair business practice.

24         THE COURT:  Here.  I don't need to hear anymore.

25   We've got some complicated issues.  That's wrong.  You can mark

1    it a perfectly safe, approved thing in a false and misleading

2    way, and that's essentially the allegation.  I haven't

3    discerned and I haven't heard you say that the FDA or somebody

4    said you have to dispense at least 30 microliters to have an

5    efficacious dosage.

6              MS. BLADOW:  My point --

7              THE COURT:  I've heard enough.  I've heard enough.

8              MS. BLADOW:  Thank you, your Honor.

9              THE COURT:  Thank you very much.

03:32 10             All right.  The defendants' motion to dismiss for lack

11    of standing is hereby denied based on economic injury in fact.

12    The plaintiffs have confirmed that they're not relying on or

13    alleging physical injury that would create or contribute to

14    creating standing.

15             Essentially, in this case, plaintiffs allege that the

16    defendants packaged eyedrops in droppers in a way that

17    dispenses more than necessary and more than the eye can absorb

18    to assure that some will be wasted and the consumers will have

19    to buy more and the defendants will make more money.

03:33 20             Among other things, plaintiffs allege that there are

21    scientific studies that support their theory that more than 15

22    microliters is not needed for an effective dose and the 30 or

23    45 microliters that various defendants' droppers dispense are

24    materially more than the eye could absorb.

25             The allegations in the complaint include in paragraph

75 that the lead researcher in a published study was told by

Alcon, defendant Alcon, marketing executives that the company

would not change the drop size because, quote, "It would mean

that patients would be able to use the bottles longer and Alcon

would therefore sell less product and make less money."

Paragraphs 66, 71, 72, 78, there are also studies

cited that essentially conclude that 16-microliter drops are as

effective as larger drops.  It's permissible to consider these

studies because they were referenced in the amended complaint.

That's *Rivera,* 575 F.3d 10, 15.

Count 1 of the amended complaint alleges a violation

of Massachusetts General Law Chapter 93A.  Chapter 93A

prohibits unfair and deceptive acts or practices.  As the First

Circuit has noted, quoting the Massachusetts Supreme Judicial

Court, "Conduct is unfair or deceptive if it is within at least

the penumbra of some common-law, statutory, or other

established concept of unfairness or immoral, unethical,

oppressive or unscrupulous."  That's *Cummings,* 244 F.3d 16, 25,

quoting the Supreme Judicial Court decision in *PMP Associates*,

366 Mass. 593, or 321 N.E.2d 915, 917.

The plaintiffs essentially allege that they and the

class they seek to represent have been unfairly overcharged for

prescription eyedrops.  Theories of unfair overcharging have

been recognized by district courts in this district, including

in *Cape Cod Commercial Linen Service*, 2014 WL 268678 at page 8,

1    which denied a motion to dismiss a Chapter 93A case alleging

2    unfair overcharges, and *Moniz*, 484 F. Supp.2d 228, 231.

3    Therefore the defendants generally alleged a plausible Chapter

4    93A claim.

5         Plaintiffs have also adequately alleged requirements

6    for standing based on economic injury in fact.  There are three

7    constitutional requirements for plaintiffs to have standing:

8    Injury in fact, causation, redressibility.  Those requirements

9    were set out by the Supreme Court in *Lujan*, 504 U.S. 555 at

03:39 10    560-61.  In *Lujan* the Supreme Court also wrote, "At the

11    pleading stage, general factual allegations of injury resulting

12    from the defendant's conduct may suffice, for on a motion to

13    dismiss we presume that general allegations embrace those

14    specific facts that are necessary to support the claim."  The

15    Supreme Court -- the First Circuit construes this requirement

16    broadly, stating in *CoxCom*, 536 F.3d 101, 107, "Plaintiffs

17    seeking to demonstrate injury-in-fact need not establish a

18    particularly damaging injury; they need only show that they

19    were directly affected by the conduct complained of, and

03:39 20    therefore have a personal stake in the suit."

21        Regarding, the First Circuit in *Adams v. Watson*, 10

22    F.3d 915, 918 has stated that, "The injury-in-fact inquiry is

23    'very generous' and that it 'serves to distinguish a person

24    with a direct stake in the outcome of litigation, even though

25    small, from a person with a mere interest in the problem,'" end

1   quote.

2           The plaintiffs here have alleged a plausible claim

3   that they've overpaid for the defendants' eyedrops.  They have

4   done that in paragraphs 11 and 90 of the amended complaint.

5   Most specifically, as I indicated in the course of the

6   argument, in paragraph 65, they describe a study published in

7   the American Journal of Ophthalmology, which quotes -- they

8   allege that that study showed Alcon refused to sell its product

9   with 15 microliter drops because, as the company's top

03:41 10  marketing executives told the study's senior author, Dr. Alan

11  Robin of John Hopkins School of Medicine, it would mean that

12  patients would be able to use the bottles longer and Alcon

13  would therefore sell less product and make less money.

14          Essentially, as the First Circuit said -- although the

15  theory of the cause of action was different in In Re:

16  Pharmaceuticals, 582 F.3d 156 at 190-191, "Overpayment is a

17  cognizable form of injury for standing purposes."  As I noted

18  in the course of the argument, Dominguez, on which the

19  defendants rely in part, is a case that was decided by the D.C.

03:43 20  Circuit on a motion for summary judgment.  What this reflects

21  is the fact that whether the defendants would charge the same

22  for smaller bottles or less is a factual issue, one that would

23  need to be addressed on a motion for summary judgment or at

24  trial.  But to me, it is plausible that the defendants would

25  charge less for smaller bottles or the same size bottles that

1    would last longer if they were dispensing 15 microliter drops

2    and that the motive for dispensing drops that are two or three

3    times that large is to make more money.

4            I've also considered the *Cottrell* case.  It discusses

5    the Third Circuit standard that is not the same as or

6    comparable to the standing under Mass. General Law Chapter 93A.

7    So for that reason, the motion to dismiss based on standing is

8    denied.

9            Then next in my outline is the motion to dismiss based

03:44 10   on impossibility preemption.  This is an affirmative defense,

11   and I noted earlier, I think, that again, it's important to try

12   to assure that we have in mind -- everybody has in mind the

13   proper standard.  What I understand the proper standard to be

14   when defendants rely on an affirmative defense in a motion to

15   dismiss is as stated by the First Circuit in *Blackstone Realty*,

16   244 F.3d 193, 197.  The First Circuit said in part, "It is well

17   established that affirmative defenses, such as the failure" --

18   in that case -- "of a contract sued upon to satisfy the statute

19   of frauds may be raised in a motion to dismiss an action for

03:45 20   failure to state a claim.  However, it is equally well-settled

21   that for dismissal to be allowed on the basis of an affirmative

22   defense, the facts establishing the defense must be clear on

23   the face of plaintiff's pleadings.  Furthermore, review of the

24   complaint, together with any other documents appropriately

25   considered under Federal Rule of Civil Procedure 12(b)(6) must

1  leave no doubt that the plaintiff's action is barred by the

2  asserted defense."

3  So that's my understanding of the standard.  My

4  understanding of the general standard of impossibility is as

5  stated in *PLIVA,* 131 S.Ct. 2567, 2579 where the Supreme Court

6  wrote, "The question for impossibility is whether the private

7  party could independently do what state law requires."  And in

8  *Wyeth*, 555 U.S. 555 at 573, this was characterized as a

9  demanding defense.

03:47 10  So I am interested in hearing from you on this one.

11  Although, without going into the specifics, it's my tentative

12  view that this motion to dismiss also is not meritorious, that

13  if the statute of limitations on something is three years, the

14  plaintiff alleges that the injury occurred in -- the case is

15  brought in 2014, it's clear that from the face of the complaint

16  that the statute of limitation bars the action.  At the moment,

17  it's not -- I know this is more complicated.  Something that's

18  complicated can also be clearer when you understand it, but at

19  the moment, it doesn't seem to me that the affirmative defense

03:48 20  is comparably clear.  But who would like to speak to this for

21  the defendants?

22  MS. JACXSENS:  Your Honor, I'm Christiana Jacxsens

23  with Greenberg Traurig.  I represent Sandoz, the Alcon

24  defendants and Falcon.  And as I described earlier, I'm

25  speaking on this topic on behalf of the defendants.  And I'm

1  sure people will send me some notes if there's things that they

2  want to chime into.

3         But we do believe that this is very clear on the face

4  of the complaint.  And I'm going to address first, and I think

5  your Honor pointed out that we have two different preemption

6  arguments here.  We have one, the impossibility preemption

7  argument.  And that applies to both the brand and the generics.

8  And then we have a separate motion that applies just to the

9  generics.  And is your question, your Honor, would you like me

03:49 10  to address the one that applies to both brand and generics?

11         THE COURT:  Yes.  That's what I'm interested in

12  focusing on now and then maybe we can go to generics.

13         MS. JACXSENS:  It is clear to us on the complaint that

14  these claims are preempted.  So just a few important background

15  points that I want to point out.  On its face plaintiffs are

16  asking for the defendants to cut the dose in half.  That

17  requires not just cutting the dose in half in that change and

18  administering then half of the active ingredients.  It also

19  requires a redesign of what's called the container closure

03:49 20  system.

21         THE COURT:  Could I just ask a question?  It may have

22  to be answered by the plaintiffs.  I thought that at least

23  part -- you say they're seeking to have you change the

24  dropper --

25         MS. JACXSENS:  Yes.

                1          THE COURT:  -- seeking to have you pay them money.

                2    This is the way I interpret it, and maybe there's a reason it

                3    hasn't been briefed this way.  I want to be as transparent as

                4    possible so this argument can be as helpful as possible.

                5          I thought they were arguing that it was designed

                6    originally before FDA approval was sought and obtained, and it

                7    was designed to -- the droppers were designed to dispense 30 or

                8    45 microliters, it says in paragraph 90, as part of a scheme to

                9    increase profits by selling more products than consumers want

     03:51     10    or need, and that was the theory.  So it's something of a --

               11    something that was designed to essentially deceive consumers

               12    into thinking they needed eyedrops of 30 to 45 microliters.

               13          And that goes even back before the approval of the

               14    FDA.  Is that part of the claim, or it's not part of the claim

               15    and there's a reason it's not part of the claim?

               16          MR. CORNFELD:  Your Honor, I'm not sure I understand

               17    your question.  What are you asking, is what not part of the

               18    claim?

               19          THE COURT:  That essentially the original design of

     03:52     20    the stoppers was to, you know, waste part of the medication and

               21    make more money as a result.

               22          MR. CORNFELD:  Yes.  Yes, your Honor.

               23          THE COURT:  And that -- I'm sorry.  Go ahead.

               24          MR. CORNFELD:  And they've kept the droppers making

               25    drops that are too large.

1           How this works on preemption, I believe, is they are

2     raising the defense that for them to change the drop size would

3     require them to do things that would result in the necessity to

4     obtain prior approval from the FDA.

5           THE COURT:  I don't even know why they would need to

6     change it.  They would just need to pay you.

7           MR. CORNFELD:  Well, our claim is for damages for the

8     amount that we -- yes, for the amount that our clients -- just

9     as your Honor just explained in the ruling -- the amount that

03:53 10     our clients spent on medication that could not be provided --

11     could not give them a therapeutic benefit.

12           MS. JACXSENS:  Your Honor, if I may address this

13     point?

14           THE COURT:  Of course.

15           MS. JACXSENS:  That isn't clear from his complaint.

16     What's clear from his complaint is that at this point in time

17     they are asking the defendants to redesign a container closure

18     system.  It's a container closure system that has never been

19     approved by the FDA.

03:53 20           THE COURT:  What makes that clear?  Is that one of the

21     remedies?

22           MS. JACXSENS:  Let me pull out the complaint.

23           THE COURT:  I suppose it's paragraph 6, prayer for

24     relief on page 74.

25           MS. JACXSENS:  Correct.

1          THE COURT:  "Awarding declaratory and injunctive

2     relief as permitted by law or equity including a preliminary

3     and permanent injunction enjoining defendants from continuing

4     the unlawful practices as set forth herein."  That's 6.

5     3, 4 and 5 ask for money damages.

6          MS. JACXSENS:  That's correct, your Honor.  So they're

7     saying you need to take these products off the market, and you

8     need to redesign them if you want to get them back on the

9     market again.  That's part of the relief that they're

03:54 10     requesting, in addition to the monetary relief.  And that is

11     part of why all these claims are preempted.  In order -- just

12     to give you a little bit of background about ophthalmic

13     products, these are special products.  So these are products in

14     which you have a sterile drug, and that's important when you're

15     dealing with the eye.  It has to be sterile.  And you have a

16     specific container closure system that's designed to protect

17     the sterility of the product.  You don't want to have your eye

18     become infected with your treatment.

19          So the FDA looks at this as a system, as one product.

03:55 20     If you're going to make changes to it, the FDA looks at that as

21     a whole, both as to changes to the dose or the ingredients but

22     also to the container closure system.  And in binding FDA

23     guidance, it has specifically said, this is an important

24     consideration, if you are going to change the container closure

25     system for products that are sterile, it does require approval

          1    by the FDA.

          2             THE COURT:  But the FDA said that in 2014, I think; is

          3    that right?

          4             MS. JACXSENS:  Yes.  Well, which --

          5             THE COURT:  I thought this was your argument, that

          6    changing the volume dispensed by the dropper would be a major

          7    change, and in 2014, the FDA issued guidance that says,

          8    "Changes that may affect the control or modify the release,

          9    metering or other characteristics, e.g., particle size of the

03:56    10    dose delivered to the patient, including the addition or

         11    deletion of a code imprint, is considered a major change."  Is

         12    that 21 CFR section 320.70?  Is that what you were talking

         13    about?

         14             MS. JACXSENS:  I'm talking about 21 CFR section

         15    314.70, the version I'm looking at was effective December 22,

         16    2008.

         17             THE COURT:  Could I have that, please, 2008.

         18             MS. JACXSENS:  Then I'm also looking an FDA guidance

         19    document.

03:57    20             THE COURT:  Hold on just one second.  What part of

         21    314.70?

         22             MS. JACXSENS:  Section B changes requiring supplement

         23    submission and approval prior to distribution of the product

         24    made using the change.

         25             THE COURT:  Hold on a second.

1          MS. JACXSENS:  Okay.

2          THE COURT:  That one says that "A supplement must be

3     submitted for any change to the drug substance, drug product,

4     production process, quality controls, equipment, or facilities

5     that has a substantial potential to have an adverse effect on

6     the identity, strength, quality, purity or potency of the drug

7     product as these factors may relate to the safety or

8     effectiveness of the drug product."

9          MS. JACXSENS:  That's right.  And if you look at

03:58 10   subsection 2, it gives examples of those types of changes.

11    This section B relates to what's called major changes.  And

12    under (b)(ii), if you look at subsection part 3.

13         THE COURT:  Hold on a second.  (b)(ii), okay.

14         MS. JACXSENS:  So the first subsection is also

15    applicable, the subsection i, which says, "Changes to the

16    qualitative or quantitative formulation of the drug product,

17    including inactive ingredients," that's what gets to the change

18    in the dose or change in the amount of the active ingredient

19    delivered.  But then if you also look at subsection iii,

03:59 20   "Changes that may affect drug substance or drug product

21    sterility assurance," that's what we're talking about with the

22    container closure systems.  And if you look at subsection iv --

23    sorry.  I'm skipping ahead a little bit -- "Changes in a drug

24    product container closure system that controls the product

25    delivered to the patient."

1          THE COURT:  Is that what a dropper is?

2          MS. JACXSENS:  That's what the dropper is.  That's

3    further described, your Honor, in a guidance that the FDA

4    issued in April of 2004.

5          THE COURT:  Not 2004.

6          MS. JACXSENS:  It was back in 2004.

7          THE COURT:  Isn't this 2008?

8          MS. JACXSENS:  I believe that this version of 21 CFR

9    314.70 was from 2008.  And I have to look back to see when the

04:00 10   original one was, but this subsection dates back to -- well, it

11   has citations back to 1974, so I need to see what the changes

12   were.  But this guidance, which dates back to 2004 --

13         THE COURT:  I'm sorry.  What's the citation to that

14   one?

15         MS. JACXSENS:  This one, the citation is 2004 WL,

16   3199016 issued April 2004.  It's called, "Guidance For the

17   Industry, Changes to an Approved NDA or ANDA."

18         On the WL citation page star 16, for the version on

19   the FDA website, which would be page 20, it has a section,

04:01 20   section 9, called "Container Closure System."  And your Honor,

21   I have an extra copy.  Would that be helpful?

22         THE COURT:  Yes.  I think that would be good.

23         MS. JACXSENS:  Okay.  I'm going to go ahead and give

24   you this one, too.

25         MR. STRAUSS:  May I approach, your Honor?

```
 1              THE COURT:  Yes.

 2              MR. STRAUSS:  This is two copies of that and two

 3     copies of that.

 4              THE COURT:  All right.  Where do you want to start?

 5              MS. JACXSENS:  I'm looking at page 16.

 6              THE COURT:  Of what?

 7              MS. JACXSENS:  Of the document that's titled "Guidance

 8     For Industry Changes to Approved NDA or ANDA."

 9              THE COURT:  What page would you like me to look at?

04:02 10         MS. JACXSENS:  Page 16, section 9, called "Container

11     Closure System."

12              THE COURT:  Okay.

13              MS. JACXSENS:  Then part B has "Major Changes, Prior

14     Approval Supplement."  And then if you look at -- so at the

15     bottom it says -- it starts talking about these are examples of

16     changes considered to have substantial potential to have an

17     adverse effect on the identity, strength, quality, purity or

18     potency of a drug product.  So that's how that fits into the

19     314.70 standard.

04:02 20         And if you look at subsection iii, the example that it

21     gives is, "A change in the primary packaging components for any

22     drug product when the primary packaging components control the

23     dose delivered to the patient," and then subsection iv is, "For

24     sterile drug products," which the ophthalmic products are, "any

25     change that may affect drug product sterility assurance such
```

  1    as," and if you look at the sixth bullet point, it says,

  2    "Changes in the size and/or shape of a container for a sterile

  3    drug product."

  4               THE COURT:  Sorry.  Where is that?

  5               MS. JACXSENS:  Part section number 4, this is on page

  6    17, and it's the one, two, three, four, five, the sixth bullet

  7    point right above number 5.

  8               THE COURT:  Okay.

  9               MS. JACXSENS:  What this guidance document is saying

04:03 10    is that it's important to the FDA.  It's considered a major

 11    change.  If you're going to make a change to a system that

 12    holds a sterile drug like ophthalmic products are, then the FDA

 13    considers that to be a major change that can have substantial

 14    potential to an adverse effect on the product that could relate

 15    to the safety or effectiveness of the drug and it wants to have

 16    the ability to give the prior approval before that's marketed.

 17               Here, in order to have a drop size that's 16

 18    microliters -- your Honor, this is currently one of the drug

 19    products at issue.  In order to change that dropper tip so that

04:04 20    it releases at 16 microliters -- this is about 34, say.  To

 21    change it to administer at half, you're talking about changing

 22    the whole design because it would have to be very narrow, as

 23    you can imagine, to have a little hole that's even smaller than

 24    this that would distribute a drop that size would be very

 25    narrow.  So you're talking about something that has to be more

1  pointed.  And that whole design would affect not only whether

2  that bottle can maintain the sterility of the product but also

3  the safety of this container closure system, which is something

4  that the FDA also considers.  Here, when you're talking about

5  patients with glaucoma, which these drugs are used to treat,

6  you are talking about patients where that would be a concern

7  for the FDA.

8          THE COURT:  Hold on just one second.

9          Let me ask you this because I believe the plaintiffs

04:05 10  point to it.  When I said "2014," I think I was remembering --

11  I mean misremembering what the FDA did in 2004.

12          What is the meaning of the following?  I think it's 69

13  FR 18745.  The FDA wrote, "For sterile drug substances, the

14  effect of changes in the size and/or shape of the container

15  closure system is considered by the FDA to be of lower risk

16  because of the differences in procedures, sterilizing drug

17  substances and drug products, but the risk is still higher than

18  for non-sterile products.  Therefore, the FDA declines to

19  specify in the regulations that these changes can be submitted

04:07 20  in a changes-being-effected supplement."

21          It appears that it left -- the plaintiff argues, left

22  the issue open for later interpretive guidance.  It also wrote,

23  "Through guidance, the FDA may identify certain container

24  closure system changes for sterile drug products that can be

25  reported other than by submission of a prior approval

supplement.  Furthermore, an applicant could submit a

comparability protocol that would allow it to implement post-

approval changes in sterile container closure systems without a

prior approval supplement."

     What's the meaning or import of that?

     MS. JACXSENS:  I think what the FDA is saying there,

your Honor, is that, since there are three levels of changes,

the moderate change, which is what plaintiffs are suggesting

defendants could do here, under what's called a CBE 30 would

apply, which means the defendants could submit it to the FDA,

basically give notice and then later on the FDA would approve.

     THE COURT:  You say they could make the change, give

notice, pending approval?

     MS. JACXSENS:  With the CBE 30 --

     THE COURT:  I'm sorry.  Go ahead.

     MS. JACXSENS:  Yes, exactly, but you can still go

ahead and market it; you would just give notice.

     THE COURT:  Without the prior approval?

     MS. JACXSENS:  Without the prior approval.  But what

that is saying is there are some changes that can be made that

may fall into that category and the FDA would let the parties

know, if that's the case, that it would fall under that

category.

     What this guidance makes clear is that they're saying

it is a major change if it's a change in the size and/or shape

1    of a container for a sterile drug product.  So the FDA did give

2    guidance on that fact that would affect the container closure

3    system here in addition to the fact that it would also be

4    considered --

5         THE COURT:  So let me just see if I get this.  You're

6    saying that the FDA recognizes there may be some changes that

7    could be made to a closure --

8         MS. JACXSENS:  System, yes.

9         THE COURT:  -- system without prior approval, but

04:09 10  those changes don't include the size and shape of a container

11   for a sterile drug product?

12        MS. JACXSENS:  That's how I read that, your Honor.

13   That's correct.

14        THE COURT:  Go ahead.

15        MR. CORNFELD:  May I respond to that, your Honor?

16        THE COURT:  I think it would be helpful if I -- just

17   on this narrow point?

18        MR. CORNFELD:  Just on this narrow point.

19        THE COURT:  Go ahead.

04:10 20       MR. CORNFELD:  If you would look at the guidance

21   document that counsel gave you, Guidance For Industry Changes

22   to an Approved NDA or ANDA, on page 17, the same one that

23   counsel has been reading from, that said that a major change --

24        THE COURT:  Where are you looking?

25        MR. CORNFELD:  If you look at page 17.

```
 1              THE COURT:  Right.  Where on 17?

 2              MR. CORNFELD:  First let's look at the last bullet

 3     point.  That's the one counsel read to you.  It says that, "A

 4     major change would be changes in the size and/or shape of a

 5     container for a sterile drug product," and if you go up and

 6     look at number 4, above that, that describes what they're

 7     talking about.  They're talking about, "For sterile drug

 8     products, any change that may affect drug product sterility

 9     assurance."  So if you change the size and/or shape, and it

10     affects the sterility assurance, that is a major change.  Now,

11     let's look down --

12              THE COURT:  But you're saying what you're advocating

13     wouldn't affect drug product sterility?

14              MR. CORNFELD:  We don't know.  But let me also -- I

15     should say we don't know on this record.  In paragraph C, just

16     below on page 17, where they talk about moderate changes, those

17     would be something that they could get on changes -- on the

18     changes-being-effected or CBE supplement and would not require

19     prior approval, if you look at paragraph B, or line B --

20     actually, let's start right after star 17.  "The following are

21     examples of changes considered to have a moderate potential to

22     have an adverse effect."  Line B says, "Changes in the size or

23     shape of a container for a sterile drug substance."

24              So what they're saying here is that that's the same

25     thing.  If you change the size or shape, if you change it in a
```

1    way that would affect sterility assurance that might let germs

2    get in or what have you, then you have to have prior approval.

3    But if it's not going to affect sterility assurance, you don't

4    need prior approval.

5            And the question will be, once we get in discovery,

6    would a change -- we know they approved -- we submitted these

7    in our briefs and in the complaint.  We know from publicly

8    available documents the FDA has approved changes in the size

9    and shape of container closure systems on a CBE 30.  The

04:12 10   question here will be would this change that would result in a

11   smaller drop size affect sterility assurance.  That is a

12   factual issue.  That's not appropriate for decision on a motion

13   to dismiss in our view, your Honor.

14           MS. JACXSENS:  Your Honor, if I may address that,

15   because I think that there is some misunderstanding from what

16   plaintiffs' counsel pointed out.  The bullet point that I point

17   out refers to a sterile drug product.  So that's the whole

18   product.  The bullet point that the plaintiffs point out to is

19   a sterile drug substance.  If you look at -- this is 21 CFR

04:13 20   200.50, called "Ophthalmic Preparations and Dispensers."

21           THE COURT:  Do you have a copy of that for me?

22           MS. JACXSENS:  You know, I don't.

23           MR. CORNFELD:  What was that again?

24           MS. JACXSENS:  21 CFR 200.50.  It's referenced in our

25   brief.  Should I put it on the Elmo perhaps?

          1              THE COURT:  Sure.

          2              MS. JACXSENS:  There's the citation, your Honor, 21

          3     CFR 200.50.  The highlighting is mine.  It says, "Informed

          4     medical opinion is in agreement that all preparations offered

          5     or intended for ophthalmic use" --

          6              THE COURT:  Don't go too fast.

          7              MS. JACXSENS:  Okay.  Sorry.

          8              THE COURT:  Go ahead.

          9              MS. JACXSENS:  -- "including preparations for

04:14    10     cleansing the eyes, should be sterile.  It is further evident

         11     that such preparations purport to be of such purity and quality

         12     as to be suitable for safe use in the eye."

         13              If you look down at subsection 3 then, it says, "The

         14     containers of ophthalmic preparations shall be sterile at the

         15     time of filling and closing."  So while this guidance related

         16     to container closure systems may apply to other drug products,

         17     the FDA has been very clear that for an ophthalmic product, the

         18     container closure system must be sterile, must protect the

         19     sterility.  That's further supported in the other guidance that

04:15    20     I handed to your Honor.

         21              THE COURT:  Let me go back to this one.

         22              MS. JACXSENS:  Okay.

         23              THE COURT:  The difference between moderate and major

         24     changes.  It's a major change if it's a change in the size

         25     and/or shape of a container for its sterile drug product.  It's

1    a moderate change if it's changes in the size or shape of a

2    container for a sterile drug substance.  Is there something

3    that explains the distinction between the product and the

4    substance?

5           MS. JACXSENS:  There is, and I'm looking to my

6    co-counsel because I think they have the citation.  It is

7    defined, and the substance is considered to be the raw

8    ingredient, so not the product that would actually be delivered

9    to the patient, versus the product, which is the ophthalmic

04:16 10   product.  This is further made clear, your Honor, if I may, in

11   this other guidance that I think may be helpful.  And this

12   guidance is called "Guidance For the Industry Container Closure

13   Systems For Packaging Human Drugs."  It was issued May 1999.

14   The citation is --

15          THE COURT:  I'm not saying seeing that on the screen.

16          MS. JACXSENS:  Sorry.  Here we go.  Let me go to the

17   front page.  Sorry.  Here we go.  1999 WL 3393528.  "Further

18   guidance" --

19          THE COURT:  What page are you on?

04:17 20        MS. JACXSENS:  I'm looking at page 18.  So first I

21   just wanted to show your Honor this page, which is Table 1,

22   page 5.  It has examples of packaging concerns for common

23   classes of drug products.  Where there's a likelihood of a

24   component dosage form interaction, and it lists ophthalmic

25   solutions and suspensions as high.  Then your Honor, look at --

1    okay.  This is section E, "Drug Products."

2              THE COURT:  What page?

3              MS. JACXSENS:  Page 18.  Sorry.  This is 18.  "Drug

4    Products For Injection and Ophthalmic Drug Products."  So it

5    explains that these ophthalmic drug products are commonly

6    solutions or emulsions or suspensions.  And actually, your

7    Honor, I do have the citation for you about the substance

8    versus product.

9              THE COURT:  We'll come back to that.

04:19 10          MS. JACXSENS:  All right.  Sorry.  So on this page it

11   explains why -- it says that, "Although the risk factors

12   associated with ophthalmics are generally considered to be

13   lower than for injectables, any potential for causing harm to

14   the eyes demands caution."  That's explaining why it's

15   considered to be, when you're looking at the potential for

16   contaminants due to -- it says, "Any contaminant present as a

17   result of contact with the packaging component or due to the

18   package system's failure to provide adequate protection can be

19   rapidly and completely introduced into the patient's general

04:20 20   circulation."  That's the case with ophthalmic products, and it

21   goes on to explain down here on page 19, "These drug products

22   are usually solutions marked in a bottle with a dropper,

23   sometimes referred to a drop-tainer.

24             THE COURT:  Okay.  Let me look at this.  Okay.  Two

25   things before you tell me about the distinction.  I'm going to

1    have a question for you.  But where do I find a distinction

2    between the product and substance?

3         MS. JACXSENS:  I have it for you here on an iPhone.

4    It's 21 CFR 314.3.  I'm not sure if I have that.

5         THE COURT:  I don't have that.

6         MS. JACXSENS:  Okay.  I'm sorry, your Honor.  I'm

7    happy to e-mail a copy of the citation if that would help.

8         THE COURT:  It's my intention to decide this this

9    afternoon if I can.  So tell me --

04:22 10         MS. JACXSENS:  So it says, "A drug product is

11   basically a product in finished dosage form, the finished form,

12   the form that goes to the patient.  For example a tablet,

13   capsule, solution that contains the drug substance generally

14   but not necessarily in association with one or more

15   ingredients."  So it's the finished dosage form.

16         THE COURT:  And the product is --

17         MS. JACXSENS:  Versus the substance, the substance

18   which is in that moderate category versus the finished form

19   which is in the major category.  "The substance is an active

04:22 20   ingredient that is intended to furnish pharmacological activity

21   or other direct effect in the diagnosis, cure or mitigation,

22   but it does not include intermediates used in the synthesis of

23   such ingredients."  So it's not the finished form.  It is what

24   would be approved if it were going to be combined or used in

25   combination to become the finished form.

 1              THE COURT:  Let me ask you this series of questions.

 2    The plaintiffs point me to 69 FR 18728-01, which is

 3    "Supplements and Other Changes to an Approved Application."  I

 4    believe I'm told that this is essentially commentary on the

 5    binding guidance that you've been pointing me to.

 6              MS. JACXSENS:  I think that's -- may I go get that

 7    copy?  I have a copy it at the desk.

 8              THE COURT:  Yes.

 9              MS. JACXSENS:  Okay.  I think I have it here in front

04:24 10    of me.

11              THE COURT:  All right.  It says, in part, in the

12    second to last paragraph, second sentence --

13              MS. JACXSENS:  Sorry.  What page was that your Honor?

14              THE COURT:  Sorry.  39, the paragraph that starts, "As

15    stated in the June 1999 proposal."

16              MS. JACXSENS:  I'm on page 39.

17              THE COURT:  Do you see the last full paragraph starts,

18    "As stated in the June 1999 proposal"?

19              MS. JACXSENS:  I'm sorry, your Honor.  If you want to

04:25 20    continue to ask your question, hopefully I can find it while

21    you're --

22              THE COURT:  Maybe we have a different version.  Are

23    you looking at the "Supplements and Other Changes to an

24    Approved Application"?

25              MS. JACXSENS:  Yes, 69 FR, and then are you looking at

1   18739?

2              THE COURT:  No.  I'm looking at 18728.

3              MS. JACXSENS:  18728, okay.

4              THE COURT:  Looking at the page, it says 39 in the

5   lower right --

6              MS. JACXSENS:  I see.  Wait.  My version isn't

7   numbered at the bottom.  Okay.  I see what you're saying.

8              THE COURT:  Do you have that paragraph?  I might give

9   it to you to put up for everybody.  Here.  Why don't you put it

04:27 10  up so we're all looking at the same thing.

11             MS. JACXSENS:  Okay.

12             THE COURT:  We have to go down to the bottom of the

13  page.  Do you see where I put that checkmark?

14             MS. JACXSENS:  Yeah.  Okay, okay.  I see.

15             THE COURT:  So was this document issued by the FDA

16  after the binding guidance we've been talking about?

17             MS. JACXSENS:  I believe it was issued before.  I

18  believe this is like the background information and the

19  commentary to the proposed guidance that the FDA was looking to

04:27 20  issue.  And then the guidance document you and I were

21  discussing is the final document.  So this is where the FDA is

22  reporting in the FR the commentary that it received on the

23  draft.

24             THE COURT:  But what's the date of that document?

25             MS. JACXSENS:  The date of the guidance just says

```
      1    "Issued April 2004."

      2         THE COURT:  And what's the date of the binding

      3    guidance that you --

      4         MS. JACXSENS:  That's all it says, "Issued April

      5    2004."

      6         THE COURT:  Well, they're both issued April 2004.

      7         MS. JACXSENS:  Right.  It's my understanding that this

      8    FR was how the FDA was publishing here's our draft guidance,

      9    we're seeking commentary.

04:28 10         THE COURT:  Well, that doesn't sound right to me.

     11         MS. JACXSENS:  Okay.

     12         THE COURT:  In my experience, the United States

     13    government doesn't issue a request for commentary and in the

     14    same month issue the regulations.  It appears to me it may have

     15    been issued simultaneously or the interpretive guidance might

     16    have been issued afterwards.

     17         MR. DeMOURA:  Your Honor, it says on the front page of

     18    the document that you want her to read from that this is the

     19    final rule.  If you look at the first page, it says --

04:29 20         THE COURT:  I don't --

     21         MR. DeMOURA:  The first page --

     22         MR. CORNFELD:  The first page of the FR.

     23         THE COURT:  We may have these in different forms.

     24    I've had more coherent presentations made to me with charts and

     25    things, frankly.  I mean, isn't this -- what I just gave
```

 1    counsel is something that was cited by the plaintiff.

 2              MR. DeMOURA:  Right.  It is the final rule.  We

 3    attached it to our materials in the form, I think it's document

 4    60-4.

 5              MS. JACXSENS:  I do have an understanding.  This is

 6    the final rule that --

 7              THE COURT:  What is it?  I can't see what you're --

 8              MS. JACXSENS:  I'm sorry.  This document that you were

 9    looking at, this one that's dated April 8, 2004, the FR

04:30 10   printout, it relates to different CFR parts that include

 11   section 314.  That was the first regulation that we were

 12   talking about.  And so this is where the FDA is setting out and

 13   addressing the comments related to different of the CFR

 14   regulations, including the 314 one that talks about what is a

 15   major change.

 16              THE COURT:  So the document I gave you came out in

 17   conjunction with the finding, with the regulations; is that

 18   correct?

 19              MS. JACXSENS:  It came out in relationship to this,

04:30 20   the 314, but it came out at the same time as this guidance that

 21   the FDA issued, that's correct, at the same time.

 22              THE COURT:  I'm not clear on this and now you have my

 23   documents.  21 CFR 314.70.

 24              MS. JACXSENS:  May I approach, your Honor?  I'm happy

 25   to give this back to you.  I'm now following along.

1    MR. CORNFELD:  Actually, I have an extra copy for his

2  Honor.

3    MS. JACXSENS:  It's okay.  I'm happy to give that

4  back.  I have that copy, so I know where we are now.

5    MR. CORNFELD:  Okay.

6    THE COURT:  But I don't have something that looks like

7  what you've got on the screen in front of me, although it's

8  probably -- I was reading it in different forms.

9    So now I have 314.70.  How does it relate to what is

04:32 10  in 69 FR 18728 that I gave you?

11    MS. JACXSENS:  So if you look at starting on page --

12    THE COURT:  Just tell me how it relates.

13    MS. JACXSENS:  This is where the FDA is setting out

14  what this final regulation is going to be.

15    THE COURT:  What it's going to be or what it is?

16    MS. JACXSENS:  What it is, but then this is the actual

17  regulation, how it appears in the CFR, and these are the

18  comments.

19    THE COURT:  Do you think I can see -- I don't mean to

04:32 20  be abrupt with you.  You're holding it up like this.  It's not

21  on --

22    MS. JACXSENS:  I apologize, your Honor.  I'm sorry.

23    THE COURT:  I have no idea what you're talking about.

24  That's 314.70, right?

25    MS. JACXSENS:  Yes.

1          THE COURT:  And I want to know how -- that regulation

2     was promulgated on what date?

3          MS. JACXSENS:  The printout that I have says this

4     version was effective September 22, 2008, but according to --

5     but there was an earlier version of this regulation in place,

6     and that was addressed in this 69 CFR from April 8, 2004.

7          THE COURT:  Okay.  That's what I gave you.

8          MS. JACXSENS:  Yes.

9          THE COURT:  Okay.  And then in that document, it says,

04:34 10    "Through guidance, FDA may have identified certain container

11    closure system changes for sterile drug products that can be

12    reported other than by submission of a prior approval

13    supplement," right?

14         MS. JACXSENS:  Right.  Other than by prior approval.

15         THE COURT:  They said that in 2004?

16         MS. JACXSENS:  Yes, your Honor.

17         THE COURT:  It says, "They may identify."  The

18    plaintiffs will have to answer this, too.  Did they ever

19    identify?

04:34 20         MS. JACXSENS:  No, your Honor.  We have not seen any

21    guidances that say for a sterile product that you do not have

22    to do the major change.

23         THE COURT:  Then the plaintiffs identify three

24    circumstances where some of the defendants purportedly made

25    changes to the container or container closure systems without

1    FDA pre-approval, instead relying on the CBE regulation, and

2    the FDA approved the changes.  What is your response to that?

3            MS. JACXSENS:  That goes to the fact that there are

4    some changes that can be made to a container closure system

5    that may not affect the sterility of the product.  So if

6    they're changing the packaging that goes around the bottle,

7    there are changes that can be made.  None of those changes that

8    plaintiffs cite to relate to changing the dispenser tip to

9    issue a smaller drop size.

04:35 10        THE COURT:  Well, which is the document that makes the

11   distinction between sterile products and sterile substances?

12           MS. JACXSENS:  That is -- this is the April 2004

13   guidance.

14           THE COURT:  How do I know that none of those changes

15   related to size or shape of the sterile drug product, and how

16   can I deal with those documents which aren't referred to in the

17   complaint on a motion to dismiss?

18           MS. JACXSENS:  I can pull up those documents

19   themselves, your Honor.  But if you read the general context of

04:37 20   the letter, you can tell that they're not the same kind of

21   changes that plaintiffs are requesting here.

22           THE COURT:  How can I consider -- I've got to remind

23   myself to go back to the proper standard.  There are only

24   certain documents that I can properly consider on a motion to

25   dismiss.  Maybe I can't consider those documents at all.  But

1  why don't you go ahead.  Then I want to hear from the

2  plaintiffs.

3       MS. JACXSENS:  Well, I would say, your Honor, first,

4  we would dispute in terms of you considering them on the basis

5  of a motion to dismiss.  But if you were going to consider

6  them, then the whole context needs to be looked at because on

7  the face of those documents themselves, it's clear that the

8  types of changes that were being requested don't fall into this

9  category of making a major change like here.

04:38 10      On the face of plaintiffs' complaint -- and you know,

11  your Honor, quite frankly, I'm sure we wouldn't be here today

12  if the plaintiffs weren't asking for a major change to these

13  drugs.  They're asking for a major change, and that major

14  change, the only way to go about making it is to drastically

15  redesign the container closure system.  In addition to the fact

16  of that, you're having a major change now, that the amount of

17  your ingredient is half, the active ingredient is half, the

18  amount of your dose is half.  And it's those doses and those

19  amounts of the ingredients that were approved by the FDA.  And

04:38 20  the FDA looked at all that in the context of the clinical

21  trials that were submitted to them that showed that at this

22  dose, at this size eyedrop, that this provided a therapeutic

23  benefit, it was effective for the patient, and it was safe.

24      What we don't have with this major change is, it's

25  asking the companies and telling them that you can just put

1    these products on the market, a container closure system that's

2    never been approved by the FDA.  You can just put it out there

3    on the market, a drug at half the dose for patients with

4    glaucoma who have trouble administering these doses to begin

5    with.  But it's asking the defendants to circumvent getting the

6    FDA approval and putting the drugs on the market without the

7    FDA blessing these major changes.

8         THE COURT:  Which of the cases -- so in which of the

9    cases, particularly the Supreme Court trilogy, supports your

04:39 10   argument most strongly?

11         MS. JACXSENS:  In *Bartlett*, your Honor, the Court said

12   once a drug, whether generic or brand name, is approved, any

13   change to the qualitative or quantitative formulation of the

14   drug product, including inactive ingredients, is a major

15   change.

16         THE COURT:  It says it's a major change.  And then

17   what does it say about preemption?

18         MS. JACXSENS:  The question of preemption --

19         THE COURT:  I'm sorry.  What page were you just

04:40 20   reading off of?

21         MS. JACXSENS:  It's 2471.  It's in part quoting the

22   section 21 CFR 314.70(b)(2)(i).

23         THE COURT:  And where does it tell me what the

24   implications of that are for preemption?

25         MS. JACXSENS:  For preemption, well, I'd like to go

1    back to the *Mensing* decision, which had the standard that,

2    "When a party cannot satisfy its state duties without the

3    federal government's special permission and assistance, which

4    is dependent on the exercise of judgment by a federal agency,

5    that party cannot independently satisfy those state duties for

6    preemption purposes."

7         THE COURT:  What page is that?  Excuse me just a

8    minute.

9         MS. JACXSENS:  It's page --

04:42 10       THE COURT:  Hold on just a second.

11        MS. JACXSENS I'm sorry.

12        THE COURT:  Sorry.  What page in *Mensing*?

13        MS. JACXSENS:  *Mensing,* it's starting at page 2580 to

14   2581.  In *Bartlett* -- going back and forth, and I apologize.

15   But in *Bartlett*, the Court at page 2479 says, "State law design

16   defect claims that place a duty on manufacturers to render a

17   drug safer by either altering its composition or altering its

18   labeling are in conflict with federal laws that prohibit

19   manufacturers from unilaterally altering drug composition or

04:43 20  labeling."

21        THE COURT:  So it's your argument that the plaintiffs

22   are seeking a change.  If a change is a major change, it

23   requires prior approval of the FDA; and if prior approval of

24   the FDA is required, the claim is preempted?

25        MS. JACXSENS:  Yes, your Honor.

```
         1            THE COURT:  Why don't I hear from the plaintiffs.

         2            MS. JACXSENS:  Can I provide one more citation for

         3    your Honor that was in our supplemental briefing?  This is to

         4    the point that this holding goes both to the brand and the

         5    generics.  I know we haven't talked about the generics and

         6    their duty of sameness; that's a different argument.  But for

         7    the brand, there was a case, Yates v. Ortho-McNeil, 76

         8    F.Supp.3d 686, that said a design defect claim against the

         9    brand is preempted.

04:45   10            THE COURT:  Sorry.  What page?

        11            MS. JACXSENS:  This is -- I need to go back to my --

        12    I'm going to go back to the desk if that's all right, your

        13    Honor.

        14            THE COURT:  Okay.

        15            MS. JACXSENS:  The Yates decision, 76 F.Supp.3d 680.

        16            THE COURT:  I have a Lexis version I think you gave

        17    me.  So what page is this version?

        18            MS. JACXSENS:  Lexis version is 2015 U.S. District

        19    Lexis 2838.  We'd be looking at --

04:46   20            THE COURT:  Actually, maybe this isn't.  Maybe I have

        21    whatever you gave me.  Yates, 76 F.Supp.3d 680.  What page

        22    after 680?

        23            MS. JACXSENS:  The pin citation is at 687.

        24            THE COURT:  What's the language that I'm looking for?

        25            MS. JACXSENS:  Well, the Court says -- it talks about,
```

 1  "The Court's discussion holding in *Wyeth* concerning the

 2  labeling does not apply to Mrs. Yates' design defect claims."

 3  It's right above the section on negligence.  "Therefore, under

 4  *Bartlett* and *Amos*, the defendants are entitled to summary

 5  judgment on a design defect claim."

 6          THE COURT:  I'm looking at the section on negligence,

 7  which is on 688, 686.  I guess I'm just not seeing what you're

 8  reading.  Read it again, please.

 9          MS. JACXSENS:  Okay.  I'll kind of start back.  Well,

04:48 10  the Court explains at 687 --

11          THE COURT:  What I can't find in the version you gave

12  me is the number 687.  I can find 686 and 688.  "Negligence" is

13  on 688, so where is it relevant on part 4, negligence?

14          MS. JACXSENS:  The conclusion and that language about

15  that the Court's discussion holding in *Wyeth* does not apply is

16  shortly above that of 688, discussion of negligence.  It's in

17  the paragraph that starts, "The issue in question does not

18  concern the adequacy of Ortho" --

19          THE COURT:  I have that.

04:49 20          MS. JACXSENS:  Sorry.  It may be the 686.  Yes, your

21  Honor.  I'm sorry.  The other -- if I may give your Honor two

22  more citations?

23          THE COURT:  No.  I want to understand the implications

24  of this right now.  It took long enough to find it.  You might

25  as well tell me.  So what?

 1          MS. JACXSENS:  So this is explaining, your Honor, that

 2     the *Bartlett* decision is not just limited to generic drugs,

 3     that it applies also to brand name drugs, and it applies

 4     specifically to issues related to a design issue in brand name

 5     drugs.  And if you look at the *Thompson* decision --

 6          THE COURT:  Does it make any difference that this was

 7     a motion for summary judgment?

 8          MS. JACXSENS:  I don't think in the case of *Yates*,

 9     your Honor.  I don't see that they've submitted where there's a

04:50 10     reference to the evidence, that it would make a difference here

 11     in the *Yates* case.  And then in the *Thompson* decision was a

 12     motion to dismiss.  And that citation is 993 F.Supp.2d 1007.

 13     This is *Thompson v. Allergan*.  These are the same allegations

 14     as here.

 15          THE COURT:  Let me get the case.  What page?

 16          MS. JACXSENS:  The pin cite is 1014.  The Court says,

 17     "In sum, the Court finds" --

 18          THE COURT:  This is going to work better if you let me

 19     find it.

04:51 20          MS. JACXSENS:  I'm sorry, your Honor.  I'm sorry.

 21          THE COURT:  Go ahead.

 22          MS. JACXSENS:  Where it says -- at 1014, above, it

 23     says, "The Court concludes that reducing the amount of medicine

 24     in each Restasis vial is a major change requiring prior FDA

 25     approval."  If you go down further, the Court concludes, "In

1    sum, the Court finds that 21 CFR 314.70(b)(2)(i) made it

2    impossible for defendants independently to comply with the

3    state law duty alleged in plaintiff's complaint."

4         THE COURT:  Okay.  Let me hear from the plaintiff,

5    please.  But just a minute.

6         MR. CORNFELD:  Your Honor, the issue here is whether

7    they could make the change to the container closure system to

8    reduce the drop size on a CBE 30.  Because under *Wyeth v.*

9    *Levine* -- or CBE 30 or less, under *Wyeth v. Levine*, then it's

04:52 10   not preempted because they could do it giving the FDA notice.

11        So what we know is that from the facts we presented

12   that came from a publicly available source, I think one of the

13   exceptions you mentioned was, is a document that's not in the

14   complaint, a public document, and these are FDA documents.  We

15   know that they changed the size or shape of the container.

16        THE COURT:  How do we know that?

17        MR. CORNFELD:  We know that because the FDA approved

18   Allergan's request on a CBE 30 to change the Zymar container

19   from 10 milliliters to 8 milliliters, containing the same

04:53 20   amount in the bottle.

21        THE COURT:  Have I been given these documents?

22        MR. CORNFELD:  Yes, your Honor.  They are exhibits to

23   our briefing.  Exhibit E, which is the letter from the FDA.

24        THE COURT:  Just one second.  Let me get the document.

25   What's the number?

        1                    MR. CORNFELD:  Exhibit E.

        2                    THE COURT:  To what?

        3                    MR. CORNFELD:  The document number?  I'm sorry, your

        4      Honor.

        5                    THE COURT:  What's the name and date of the document?

        6                    MR. CORNFELD:  It's an FDA letter.

        7                    THE COURT:  No.  You've submitted it.  What was it

        8      attached to?

        9                    MR. CORNFELD:  We submitted it with our brief in

04:54  10      response to the omnibus motion to dismiss.

       11                    MR. DeMOURA:  That would have been document number 60,

       12      your Honor.

       13                    THE COURT:  Can somebody give me a copy?

       14                    MR. CORNFELD:  Yeah.  I have it here.

       15                    THE COURT:  It may have been lost in transit.  I guess

       16      I have Exhibit E.

       17                    MR. CORNFELD:  Also, your Honor, Exhibit F and Exhibit

       18      G.

       19                    THE COURT:  I guess I need F and G.

04:56  20                    MR. CORNFELD:  All right, your Honor.  Your Honor, may

       21      I approach?

       22                    THE COURT:  Yes.

       23                    MR. CORNFELD:  So your Honor, the issue --

       24                    THE COURT:  What is Exhibit E?  Tell me.

       25                    MR. CORNFELD:  Exhibit E is a letter available on the

 1     FDA's website to Allergan that approves a new bottle on the CBE

 2     30.  If you look at the paragraph that begins, "These changes

 3     being effected in 30 days."  That's the third paragraph after

 4     "Dear Ms. Bancroft."

 5          "These changes being effected in 30 days supplemental

 6     new drug applications provide for a change in the fill size 5

 7     milliliters of drug product in a 10 milliliter bottle and

 8     corresponding labeling revision.  We completed our review of

 9     these applications as amended.  These applications are approved

04:57 10   effective on the date of this letter."  And the date of the

11     letter is June 20, 2005.

12          THE COURT:  Let's see.

13          MR. CORNFELD:  That's on the last page, your Honor.

14          THE COURT:  It's on where?

15          MR. CORNFELD:  On the last page.  Do you see Linda Ng,

16     and then 6/20/05?

17          THE COURT:  Yes.

18          MR. CORNFELD:  Okay.  The other two exhibits are the

19     labels from before that letter, so we see what was the size.

04:58 20   And if you look at the last page, where it says, "How

21     Supplied" -- I'm sorry, Exhibit F, the last page has a section

22     called "How Supplied."  This is the label -- it's also a public

23     document on the FDA 's website.  And it says, "5 milliliters in

24     an 8 milliliter bottle," and we know the date of this label is

25     2003, so it predates what the FDA was approving.

1          And then the next exhibit is Exhibit G.  And if you

2     look, that's the label following the FDA's approval because

3     this is -- and I guess you have to take my word for it, your

4     Honor.  This is on the FDA's website opposite the 2005

5     approval.  So on the FDA's website of drugs at FDA, it shows

6     the letter that we just looked at and this label.  And if you

7     look at "How Supplied," at the back of the label, it says, "5

8     milliliters in a 10 milliliter bottle."

9          THE COURT:  Do you have two other examples?

05:00 10          MR. CORNFELD:  There were two other examples.  They

11    were approvals on a CBE 30 of what is described as a new

12    container closure system for Allergan's drug Alocril and also

13    for its drug -- these are both eyedrop drugs -- its drug

14    Alphagan-P.  Those are cited in the brief and attached as

15    exhibits.

16          Your Honor, the issue, as you described it before, on

17    an affirmative defense where they're raising this on a motion

18    to dismiss has to be whether it's clear, whether it's clear

19    that they are preempted -- our claim is preempted and they

05:01 20    prevail.  I don't think any of this is clear.  For example,

21    what counsel was just going through regarding changes in the

22    size or shape of a container closure system that would change

23    the sterility assurance.  We know that they have done these

24    approvals of changes in size or shape of container closure

25    systems.  Would the change in this instance affect the

```
 1    sterility assurance?  There's nothing in this record to

 2    establish that.  It's their burden, as your Honor --

 3              THE COURT:  Say that again, please.

 4              MR. CORNFELD:  Okay.  The question for the change in

 5    the container closure system, as counsel said and as we also

 6    agree, if it would affect the sterility assurance, it requires

 7    prior approval.  The regulation says that.  If it doesn't

 8    affect the sterility assurance, it would not require prior

 9    approval.

05:02 10          Would this change affect the sterility assurance?  In

11    other words, your Honor, would it make -- would it present a

12    major potential for an adverse effect, to make these changes,

13    an adverse effect in terms of sterility assurance.  It's their

14    burden to establish that.  There's nothing in the record right

15    now that can answer that one way or the other.

16              THE COURT:  Well, now let me go back to, when you say

17    would these changes have an adverse effect in terms of

18    sterility assurance, what are you referring to, a regulation

19    for guidance?

05:03 20          MR. CORNFELD:  Yes, the regulation says --

21              THE COURT:  Which regulation?

22              MR. CORNFELD:  314.70.  It's in section (b).  It's

23    also in the guidance document.

24              THE COURT:  Now I want to -- 314.70?

25              MR. CORNFELD:  Section (b).  If your Honor would give
```

1    me just a minute.

2           THE COURT:  It says, "Changes that may affect drug

3    substance or drug product sterility assurance, such as changes

4    in drug substance, drug product, or component sterilization

5    methods" are changes requiring prior approval, right?

6           MR. CORNFELD:  It's Roman numeral iii, your Honor,

7    (b)(iii), "Changes may affect drug substance or drug product

8    sterility assurance, such as."

9           THE COURT:  None of those such as's are contained --

05:04 10        MR. CORNFELD:  I guess we're talking about the

11   guidance document, your Honor.

12          THE COURT:  Well, I thought that actually helped you.

13   But then the guidance document from 2004 --

14          MR. CORNFELD:  Yeah, yes.

15          THE COURT:  -- "For sterile products, any change that

16   may affect drug product sterility assurance, such as changes in

17   the size and shape of a container for a sterile drug product,"

18   that's a major change requiring prior approval.

19          MR. CORNFELD:  Right, yes, if it may affect drug

05:05 20   product sterility assurance.  We know that not all changes to

21   the size or shape of the container closure system will do that

22   because we know that the FDA has approved changes in the size

23   or shape.  It did that in the case of Zymar.

24          THE COURT:  Without requiring --

25          MR. CORNFELD:  Without prior approval.  It was on a

```
 1    CBE 30.
 2              THE COURT:  So would it be correct to reframe your
 3    argument to say it's a factual issue as to whether changing in
 4    the size and shape of a container for a sterile product may
 5    affect drug product sterility?
 6              MR. CORNFELD:  Yes, your Honor.  Yes.  Thank you.  I
 7    was hoping to be able to say that, but yes.  Yes, it is a
 8    factual issue because there's nothing in the record to answer
 9    that based on the pleadings and based on --
05:06 10          THE COURT:  Well, I think I can anticipate, but list
11    it as an example of something that may affect --
12              MR. CORNFELD:  They say that if it may affect
13    sterility assurance, then it requires prior approval.  If it's
14    something that won't, and we know in the instance of Zymar --
15              THE COURT:  No.  It says, "For sterile drug product,"
16    so we're talking about a sterile drug product.  It says, "Any
17    change that may," not "any change that will," but "any change
18    that may affect product sterility assurance such as changes in
19    size and/or shape of a container for a sterile drug product."
05:07 20   So that seems to be saying that a change in the size or shape
21    may affect sterility assurance and therefore requires prior
22    approval.
23              MR. CORNFELD:  Well, your Honor, I think in order to
24    be able to answer that conclusively, it helps to look at what
25    the FDA has done, what the companies have done in submitting
```

1 CBE 30s for the change in size or shape of a container closure

2 system as a CBE 30, and what the FDA has done would show us how

3 these companies and how the FDA interprets that regulation in

4 real life.  If it may affect the sterility assurance, it would

5 be a major change, but not all changes to a container closure

6 system size or shape will do that.

7   THE COURT:  Perhaps not all will do that.  But maybe

8 all may do that.

9   MR. CORNFELD:  Well, in the case of Zymar, they

05:08 10 approved it on a CBE 30 with a change in -- we know the size.

11 It went from 8 milliliters to 10 milliliters.  We know that

12 there were other container closure system changes that we

13 cited.

14   THE COURT:  All right.  I gave the defendants a long

15 time.  I'll give you more time, too, but I think I'm not going

16 to achieve my goal in deciding this issue today.  You focused

17 me on some issues that I'm going to do some more work on.

18   MR. CORNFELD:  Your Honor, I believe we have shown, at

19 least, this is not clear, as I said.  We have also shown a

05:09 20 basis -- we have at least one example of the FDA interpreting

21 the regulation to mean that just because something is a change

22 in the size or shape, it doesn't affect sterility assurance,

23 and we should be entitled to discovery from their files to find

24 other examples.

25   In one of our other cases we received partial

1    discovery from the plaintiffs -- excuse me, from the defendants

2    and --

3             THE COURT:  In which case?

4             MR. CORNFELD:  In the *Eike* case in Illinois, those

5    subject documents are subject to a protective order for

6    confidentiality.

7             THE COURT:  Was there a motion to dismiss in this

8    case, in either of those other two cases?

9             MR. CORNFELD:  Yes.

05:10 10          THE COURT:  So there was a motion to dismiss based on

11   preemption?

12            MR. CORNFELD:  Yes.

13            THE COURT:  It was granted in New Jersey.

14            MR. CORNFELD:  Not on preemption.  The Court didn't

15   reach that issue.

16            THE COURT:  On standing.

17            MR. CORNFELD:  On standing.  In the Southern District

18   of Illinois the Court denied the motion to dismiss.

19            THE COURT:  Do I have that decision?

05:10 20          MR. CORNFELD:  You have it cited in the brief to the

21   Court.

22            THE COURT:  What's the name of it?

23            MR. CORNFELD:  It's *Eike*, E-i-k-e.  *Eike v. Allergan*,

24   your Honor.

25            THE COURT:  All right.  Is there more you would like

1    to say now?

2              MR. CORNFELD:  I think, unless your Honor has other

3    questions or my co-counsel has something he thinks I should

4    have said, no, your Honor.  Thank you, your Honor.

5              THE COURT:  I want to do -- I'm sorry.  Is there

6    something you wanted to say?

7              MS. JACXSENS:  I was going to respond very briefly,

8    your Honor, to the points he made about these documents.

9              THE COURT:  Very briefly.

05:13 10         MS. JACXSENS:  Very briefly.  I first just wanted to

11   point out that even on its face, none of these documents talk

12   about the redesign of a dropper system that's never been

13   submitted or approved by the FDA before, none of them on their

14   face.  You can see that.  None of them talk about the redesign

15   of a dropper.

16              The second point, I would like to refer your Honor to

17   footnote 4 of our reply brief that addresses why these

18   documents also do not make a difference.  I'm happy to make

19   that point very briefly.

05:13 20         THE COURT:  Go ahead.

21              MS. JACXSENS:  That point is that preemption is an

22   issue of law, and you're looking at the conflict between the

23   state law and the federal law.  There may be situations where a

24   particular regulator may not follow the guidance.  But what

25   *Mensing* says, it says at 2579, it said, "We can often imagine

1    that a third party or the federal government might do something

2    that makes it lawful for a private party to accomplish under

3    federal law what state law requires of it.  If these

4    conjectures suffice to prevent federal and state law from

5    conflicting for supremacy clause purposes, it is unclear when

6    outside of express preemption the supremacy clause would have

7    any force."

8         And the third point just briefly, your Honor, is that

9    in addition to that section that we focused on, the point

05:14 10   number 3 in the guidance, the sixth bullet point, this would

11   also be considered a major change under part 3 of that section

12   related to changes to a primary packaging component control if

13   it's a dose delivered to the patient, as well as it would be

14   considered a major change because of the issue that it would

15   include half of the inactive ingredients and half of the dose.

16        THE COURT:  Okay.  I'm going to do the following.  And

17   given the large number of lawyers in the room, I don't think

18   this will be an inordinate burden.  I'm going to order you to

19   order from the court reporter on an expedited basis the

05:15 20   transcript of this hearing, which has been helpful in focusing

21   me but not sufficiently that I feel I can decide this matter

22   orally.  As I may have formulated earlier, the fact that

23   something is complicated, lots of regulations, doesn't mean it

24   may not be clear once I try to figure it out, so I want to do

25   some more work to try to figure it out.

```
        1           You filed a lot already.  But would you like to have,

        2    say, roughly to next Wednesday, or something like this

        3    Thursday, to file something -- you know what questions I've

        4    asked you today.  You've cited lots of documents.  And you

        5    know, you might now present what you presented before in a more

        6    focused way.  I was aware of your footnote, for example, the

        7    fact that somebody departed from the law doesn't mean the

        8    matter is not preempted.  But the things you've emphasized

        9    right at the end here are not the things that were primarily

05:17  10    emphasized in the brief.  So I'll give you that chance.  But I

       11    don't want to put this down for very long.  I propose to at

       12    least tentatively see you again in two weeks, if the key

       13    participants can be here, because I'd like, if I can, to decide

       14    these matters orally.  And then, you know, if I dismiss it,

       15    it's over.  If I don't dismiss it, we can schedule the rest of

       16    the case.

       17           So looking at my schedule at the moment, I don't have

       18    anything scheduled on Friday the 13th.

       19           MR. STRAUSS:  I've got a pretrial that day, your

05:18  20    Honor.  I don't know if there's another day that would work

       21    besides that particular Friday.

       22           THE COURT:  Well, there's not many.  How about

       23    Thursday the 12th possibly?  And since you're cooperating so

       24    well, perhaps I don't need every single one of you.  I mean,

       25    defense counsel cooperate.
```

1          MR. CORNFELD:  May I ask --

2          THE COURT:  Hold on.  Does anybody have a problem with

3     the 12th?  Apparently not?

4          MR. CORNFELD:  Your Honor, do I correctly conclude

5     from what you just said that you will simply be announcing your

6     decision and not asking for more argument?

7          THE COURT:  If I want more argument, I'll let you

8     know.

9          2:00 on Thursday the 12th.  Do you want an opportunity

05:19  10    to file something further?  Not raising anything, it shouldn't

11    raise anything new.  That wouldn't be fair.  And I can't --

12    with all these lawyers, you must have thought of everything

13    before today.  But just organizing it to focus -- my tentative

14    view is that, to be colloquial, this is the ball game.  I don't

15    at the moment see -- but I'm going to get more deeply into

16    this, too -- that there's an argument for the generics that

17    would prevail if the argument for the other defendants doesn't

18    prevail.  I may listen to you on that.  I want to get more

19    deeply into it, too.  I'm not dismissing the Chapter 93A claim

05:20  20    analysis.  Essentially unjust enrichment or money received --

21    I've never heard -- it's not material if the case is -- not

22    going to have a case over New York law on money received if the

23    federal claims are preempted.

24          Without ruining your weekends and your lives or the

25    weekends and lives of people who work for you, any

submissions -- and they don't need to be that long, and you can

tell me where I'll find more elaborate -- you know, they

shouldn't be more than 20 pages.  But that's the usual limit

anyway.  What if I give you until November 4, which is

Wednesday, or November 5, which is Thursday?

MS. JACXSENS:  November 5 would be appreciated, your

Honor.  Just with the -- I know for me, with small kids with

the holiday weekend.

THE COURT:  That's fine.

MR. STRAUSS:  Your Honor, I just have a question.  I

wasn't sure what you wanted us to do with the transcript.

THE COURT:  I want you to order it on an expedited

basis, and my guess is you'll get it Monday.

MR. STRAUSS:  That's fine.

THE COURT:  Probably no later than Tuesday.

MR. STRAUSS:  That won't affect the 5th at all.

THE COURT:  Right.  And presumably somebody's been

taking notes.  The court reporter is good at this, and we're at

page 72, so you'll get it Monday or Tuesday.

MR. STRAUSS:  Great.  I don't mean to -- if you're not

finished, I'll sit down.  I just have one question, but I can

do it at any time.

THE COURT:  Well, I'm also going to order the

following; that say by the 9th, that you confer, tell me

whether you've settled this case, but particularly -- I'll give

1    you --

2            (Phone interruption.)

3            THE COURT:  I'm supposed to fine you for that.

4            MS. JACXSENS:  I'm so sorry.  I was looking at my

5    calendar so I turned it on, your Honor.  I apologize.

6            THE COURT:  Let's say the 10th by 12:00 noon, I want

7    you to, A, let me know if you've settled; and B, give me a

8    schedule for the case to proceed, preferably jointly but

9    separately if necessary.  I assume that if the case is not

05:23 10   dismissed and we go to class certification, it strikes me that

11   there may be some complex class certification issues.  Maybe we

12   wouldn't go to class certification.  I can foresee you may have

13   different views on that.  I don't know how we would proceed.

14           If I see you on the 12th and I don't dismiss the case,

15   which is an open question, then I'm going to sit down with you

16   and hopefully establish a schedule for the rest of the case or

17   the next phase of the case.  I'm somewhat concerned that there

18   are three parallel cases, but I guess the parties are different

19   in each case.  The issues are the --

05:24 20          MR. CORNFELD:  Your Honor, in this case and in the New

21   Jersey case, the plaintiffs obviously are different, but the

22   lawyers for the plaintiffs are the same.  And the defendants

23   are the same, and I believe the lawyers are all the same.

24           THE COURT:  I'm just really thinking off the top of my

25   head whether there's going to be any issues of fact or issue

```
 1   preclusion, but maybe not.
 2         MR. CORNFELD:  They're all going on at the same time.
 3   I guess if one finished, there could be, if one finished before
 4   the others.
 5         THE COURT:  Well, if that were the case, some of us
 6   are wasting time and money.  The Illinois case is the oldest
 7   case?
 8         MR. CORNFELD:  Yes, your Honor.
 9         THE COURT:  All right, is there anything else in this
10   matter for today?
11         MS. BLADOW:  No, your Honor.
12         MR. DeMOURA:  Thank you very much, your Honor.
13         THE COURT:  Mr. Bartlett will give you a copy of the
14   usual scheduling order, but it's not really going to fit for
15   the purposes of this case.  You'll need something that's
16   fine-tuned for a class action, but he'll give you that.  Okay.
17   Court is in recess.
18         (Whereupon the proceedings adjourned at 5:25 p.m.)
19
20
21
22
23
24
25
```

1

2                 CERTIFICATE OF OFFICIAL REPORTER

3

4              I, Kelly Mortellite, Registered Merit Reporter

5      and Certified Realtime Reporter, in and for the United States

6      District Court for the District of Massachusetts, do hereby

7      certify that pursuant to Section 753, Title 28, United States

8      Code that the foregoing is a true and correct transcript of the

9      stenographically reported proceedings held in the

10     above-entitled matter and that the transcript page format is in

11     conformance with the regulations of the Judicial Conference of

12     the United States.

13                         Dated this 2nd day of November, 2015.

14

15                         /s/ Kelly Mortellite

16                         _____

17                         Kelly Mortellite, RMR, CRR

18                         Official Court Reporter

19

10:33 20

21

22

23

24

25