**\*NOT FOR PUBLICATION\***

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ : | | |
| LENOARD COTTRELL, *et al.*, : | Civ. Action No.: 14-5859(FLW) | |
| : | | |
| Plaintiffs, : | | |
| : | | |
| v. : | | |
| : | **OPINION** | |
| ALCON LABORATORIES, INC., : | | |
| *et al.*, : | | |
| : | | |
| Defendants. : | | |
| _____: | | |

**WOLFSON, District Judge:**

For lack of standing**,** the Court previously dismissed this putative consumer class action, comprised of in- and out-of-state plaintiffs[1] accusing defendant pharmaceutical manufacturers and distributors[2] of engaging in unfair and illegal business practices.

---

[1]  These plaintiffs include: Leonard Cottrell, Sandra Henon, William Reeves, George Herman, Simon Nazzal, Carol Freburger, Jack Liggett, Patricia Bough, Mack Brown, Dolores Gillespie, Deborah Harrington, Robert Ingino, Edward Rogers, Jr., Deborah Rusignulolo, Dorothy Stokes, Josephine Troccoli, Hurie Whitfield, Thomas Layloff, Carolyn Tanner, Patsy Tate, John Sutton, Jesus Renteria, Glendelia Franco and Nadine Lampkin (collectively, "Plaintiffs").

[2]  Plaintiffs name as defendants both brand-name and generic pharmaceutical manufacturers and their distributors. The brand name companies include: Alcon Laboratories, Inc., Alcon Research, Ltd., Allergan, Inc., Allergan USA, Inc., Allergan Sales, LLC, Pfizer Inc., Valeant Pharmaceuticals International, Inc., Bausch & Lomb, Inc., Aton Pharma, Inc., Merck & Co., Inc., and Merck, Sharpe & Dohme Corp. (collectively, the "Brand Name Defendants"). The generic companies are Falcon Pharmaceuticals, Ltd., Sandoz Inc., Prasco LLC, Akorn, Inc. (collectively, the "Generic

*See Cottrell v. Alcon Labs, Inc.*, No. 14-5859, 2015 U.S Dist. LEXIS 81830 (D.N.J. Jun. 24, 2015). However, the Court provided Plaintiffs an opportunity to amend their Complaint to cure the deficiencies as to standing. In the instant matter, the Generic and Brand Name Defendants separately move once again to dismiss the Amended Complaint, challenging, *inter alia*, Plaintiffs' new theory of Article III standing. Because the Court finds that Plaintiffs' amendments fare no better than their original allegations, for the reasons set forth here, Plaintiffs' Amended Complaint is dismissed for want of standing.

## BACKGROUND and PROCEDURAL HISTORY

Because the relevant facts of this case were recounted in this Court's previous Opinion, to promote economy, they will be incorporated here. To summarize the alleged facts, Defendants are makers and distributors of various FDA-approved prescription eye drop medications. *See* Am. Compl., ¶ 1. These medications are sold as fluid, in a given volume, in plastic bottles. *Id.* at ¶ 4. Plaintiffs allege that Defendants set the price for these medications without "stating how many doses are contained in the bottles or how many days they will last." *Id.*

As a part of the alleged illegal and unfair business practices, Plaintiffs aver that Defendants have deliberately

---

Defendants"). All defendants will be collectively referred to as "Defendants."

designed and manufactured the tips of the bottles to dispense larger than necessary drops of medication, in an effort to compel consumers, like Plaintiffs, "to pay for much more medication than the users of those medications needed." *Id.* at ¶ 1. In that connection, Plaintiffs allege that the large tips lead to dispensing excess fluid from the bottle that "cannot be used, is entirely wasted, provides no pharmaceutical benefit, and is often harmful." *Id.* at ¶ 5.

Previously, the Court dismissed Plaintiff's original complaint based on a lack of standing. In that Opinion, I rejected Plaintiffs' theory that they were injured when Plaintiffs were precluded from using the wasted eye drops, because, absent any allegation that consumers were promised a specific number of doses or drops and that they failed to receive those amounts, Plaintiffs' theory of loss was too conjectural.

In their Amended Complaint, to be clear, Plaintiffs are not complaining of physical injuries from the use of these eye drops, but rather, Plaintiffs theorize that if the tips were made smaller, Plaintiffs would necessarily be able to use the wasted drops, and that would produce a cost savings to Plaintiffs. In that regard, Plaintiffs premise their standing on the "invasion of [a] legally protected interest," that is, "the practice of Defendants in selling their products in a form that compelled Plaintiffs to waste large quantities of medication that were not useful for treatment

3

of their disease." Id. at ¶ 175. Plaintiffs aver that that they would personally benefit from a court order "requiring that Defendants reimburse them for the amount they spent on the not-useful amounts of medication." *Id.* Alternatively, as to standing, Plaintiffs allege that their therapy would have cost less if their eye drops had been smaller." *Id.* at ¶ 178.

In support of their theories of standing, Plaintiffs included various scientific literature opining that 1) a smaller drop volume would provide patients with the maximum therapeutic result; and correspondingly, 2) smaller drop sizes would lead to economic benefits, i.e., cost savings. *See* Am. Compl., ¶¶ 179, 183, 185, 188, 196, 200. For example, one article stated "smaller drops would be preferable to minimize systemic exposure and spilled or wasted medication. Obviously, a smaller drop size would mean that more doses could be dispensed form each bottle of medication, providing cost savings to patients and managed care providers." *Id.* at ¶ 200.

Plaintiffs also included charts that set forth the amount that each of the named Plaintiffs spent on purchasing the medication, the amount of medication in milliliter, the alleged wasted portion of the drop, and, allegedly, the amount of money spent on the wasted portion. *See Id.* at ¶¶ 225-231. To calculate the money spent on the wasted portion, it appears from the charts that Plaintiffs simply divided the purchase price by the amount of

4

medication, and then multiplied that number by the amount of the alleged wasted portion of the drop.

In their Amended Complaint, Plaintiffs assert twenty-three causes of action against Defendants. Plaintiffs seek to bring these claims individually, and on behalf of classes of consumers and third-party payors who have paid all or part of the purchase prices of prescription eye drops manufactured and sold by Defendants. More specifically, each of the named plaintiffs asserts consumer fraud related claims applicable in the state in which he/she resides. Those state laws include: New Jersey Consumer Fraud Act, California Unfair Competition Law, Florida Deceptive and Unfair Trade Practices Act, Illinois Consumer Fraud Act, North Carolina Unfair and Deceptive Trade Practices Act and Texas Deceptive Trade Practices Act.

On these current motions, the Brand Name and Generic Defendants move separately to dismiss all of Plaintiffs' claims based on standing, preemption and failure to state a claim.[3]

---

[3]      As I have stated in my previous Opinion, to date, similar claims against Defendants have been brought in three other federal jurisdictions: Florida, Missouri, and Illinois. In the Florida action, *Freburger v. Alcon Labs.*, No. 13-24446 (S.D. Fla.), plaintiffs voluntarily dismissed the lawsuit before oral argument on a pending motion to dismiss. In the Illinois case, *Eike v. Allergan, Inc.*, No. 12-1141 (S.D. Ill.), the court there denied defendants' motion to dismiss based on similar grounds to those asserted here. However, the district court in the Eastern District of Missouri dismissed plaintiffs' claims on identical arguments raised by Defendants in this matter. *See Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014).

5

Because I find that Plaintiffs have failed to cure their standing requirements, I will confine my discussion only to that issue. And, because standing is dispositive of this case, I am deprived of jurisdiction to hear the case on its merits. *See Finkelman v. National Football League*, 810 F.3d 187, 193 (3d Cir. 2016) ("[a] federal court's obligation to assure itself that it has subject matter jurisdiction over a claim is antecedent to its power to reach the merits of that claim.")(citations omitted).

## DISCUSSION

### I. Standing

I will reiterate my previous recitation of the law with regard to standing. Article III of the Constitution limits the scope of the federal judicial power to the adjudication of "cases" or "controversies." U. S. Const. art. III, § 2. This "bedrock requirement," *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), protects the system of separation of powers and respect for the coequal branches by restricting the province of the judiciary to "decid[ing] on the rights of individuals." *Marbury v. Madison*, 5 U.S. 137 (1803). Indeed, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997)

6

(quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).

Courts have developed several justicability doctrines to enforce the case-or-controversy requirement, and "perhaps the most important of these doctrines" is the requirement that "a litigant have 'standing' to invoke the power of a federal court." *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012)(quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). The seminal standing question is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf." *Id.* (internal quotations and citations omitted).

To establish Article III standing, a plaintiff bears the burden of sufficiently alleging three elements: 1) an injury-in-fact; (2) a sufficient causal connection between the injury and the conduct complained of; and 3) a likelihood that the injury will be redressed by a favorable decision. *Finkelman*, 810 F.3d at 193.

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-

7

61 (1992) (internal quotations, alterations, and citations omitted). In addressing this element, the Third Circuit recently stressed that "to be concrete, an injury must be real, or distinct and palpable, as opposed to merely abstract." *Finkelman*, 810 F.3d at 193 (citations and quotations omitted). To be particularized, "an injury must affect the plaintiff in a personal and individual way." *Id.* In that regard, "Plaintiffs do not allege an injury-in-fact when they rely on a chain of contingencies or mere speculation." *Id.*

Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Lujan*, 504 U.S. at 560-61. This requirement is "akin to but-for causation in tort and may be satisfied even where the conduct in question might not have been a proximate cause of the harm, i.e., indirect causal relationship. *Finkelman*, 810 F.3d at 193. Finally, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.

Of these three elements, the Third Circuit has advised that "the injury-in-fact element is often determinative." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009). Hence, it bears repeating that the complained-of injury must not

8

be abstract or subjective. *See Id.; Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Allegations of a potential future injury, or the mere possibility of a future injury, will not establish standing. *See Whitmore v. Arkansas, 495 U.S. 149*, 158 (1990); *Employer's Ass'n of New Jersey v. New Jersey*, 601 F. Supp. 232, 238 (D.N.J. 2003), aff'd 774 F.2d 1151 (3d Cir. 1985). While economic injury is one of the paradigmatic forms of standing, *see Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005), a demand for damages, by itself, will not establish an injury-in-fact. *See Rivera v. Wyeth-Ayerst*, 283 F.3d 315, 320 (5th Cir. 2002); *Koronthaly v. L'Oreal USA, Inc.*, No. 07-5588, 2008 U.S. Dist. LEXIS 59024, at *13 (D.N.J. Jul. 29, 2008).

Moreover, "the 'injury-in-fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself [or herself] among the injured." *Id.* at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972)). The injury must also be "an invasion of a legally protected interest." *Id.* at 560. In other words, the injury-in-fact requirement exists to assure that litigants have a "personal stake" in the litigation. *See The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000). By ensuring that litigants present actual cases and controversies, courts can keep the judicial branch from encroaching on legislative prerogatives, thereby preserving the separation of powers. *See*

9

*Valley Forge v. Americans United for Separation of Church and State*, 454 U.S. 464, 473-74 (1982).

"[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen*, 468 U.S. at 752. In that regard, at the pleading stage, "[a]lthough general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (quoting *Lujan*, 504 U.S. at 561); *Whitmore,* 495 U.S. at 155; *see, e.g.*, *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 88 (3d Cir. 2000) ("Standing is established at the pleading stage by setting forth specific facts that indicate that the party has been injured in fact or that injury is imminent, that the challenged action is causally connected to the actual or imminent injury, and that the injury may be redressed by the cause of action.").

In assessing the sufficiency of the plaintiff's allegations related to standing, the Third Circuit has summed up the process:

> First, we "tak[e] note of the elements a plaintiff must plead to state a claim"—here, the three elements of Article III standing. Second, we eliminate from consideration any allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "where there are well-pleaded factual allegations, [we] assume their veracity and then determine whether they plausibly" establish the prerequisites of standing. In conducting this analysis,

10

we are mindful of the Supreme Court's teaching that all aspects of a complaint must rest on "well-pleaded factual allegations" and not "mere conclusory statements." Thus, to survive a motion to dismiss for lack of standing, a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue."

*Finkelman*, 810 F.3d at 194 (citations omitted). To be sure, the plaintiff cannot rely on assertions that are merely "speculative or conjectural." *Id.*

**A.   Plaintiffs' Pricing Theory**

In Plaintiffs' original complaint, they allege that if Defendants made the tips of the dispensers smaller, the cost of the medications would decrease, thereby producing a cost savings to consumers. I rejected this theory as hypothetical and conjectural, because Plaintiffs failed to allege any bases for their assertion that Defendants would price "smaller-tipped" bottles less expensively than their current version.

On their second attempt to establish standing, Plaintiffs did not abandon this theory, but rather, they devote multiple pages of their Amended Complaint to citing various articles and studies that express those authors' opinions regarding the size of the drop volume. *See* Am. Compl., ¶¶ 178-216. Indeed, according to those articles, from a therapeutic stand point, smaller drop sizes would be more beneficial to the patients. But, it appears these articles go on to opine on the economic effects of the decreased drop sizes; that is, lower costs. However, reliance on these

11

articles does not cure the speculative nature of Plaintiffs' pricing theory.

While it is difficult — from the allegations — for the Court to discern the methodology from which these articles base their conclusion regarding pricing, one of the articles Plaintiffs cite, however, provides some insight:

> The economic impact of using a smaller drop may be illustrated by Propine 0.1%. An average bottle labeled 15.0 ml actually contained an average of 15.5 ml with a drop volume determined to be 39.8 µl.  The average bottle yielded 389 eyedrops, sufficient for 13.9 weeks of therapy (both eyes, twice daily use) . . . . If the eyedrops could be reduced to 15 µl . . . the average bottle would yield 1,0333 drops, sufficient for 36.9 weeks of therapy . . . . Alteration of eyedrop delivery systems and alteration of the medication's physical properties to produce smaller drops could greatly diminish the cost of topical glaucoma therapy . . . .

Am. Compl., ¶ 185.  It appears, simply, that the author assumes as true that manufacturers of eye drops would price their medication solely based on the volume of the fluid contained in the bottles. That same assumption underlies Plaintiff's own theory, which is reflected in Plaintiffs' charts.

On the other hand, some articles are not as unequivocal; for example, in ¶ 192 of the Amended Complaint, Plaintiff relies on an article entitled, *Cost Consideration of the New Fixed Combinations for Glaucoma Medical Therapy*, which only suggests that the "[f]inal cost of therapy may be based on **several** factors beyond that of the retail price and include the drop size and the amount of drops per

12

bottle." Am. Compl, ¶ 192 (emphasis added); *see also* § 199 ("[m]any factors influence the daily cost of therapy for eyedrops.").

Additionally, the remaining articles to which Plaintiff cite, state in passing and conclusory terms that smaller drop volume would likely produce lower costs. *See, e.g.*, *Id.* at ¶ 179 ("[a]n important benefit of using a smaller instilled volume, in addition to improved drug activity and lower cost, is a potential decrease in side effects from ophthalmic drugs."); ¶ 183 ("Drop size and method of delivery are also important from an economic standpoint since tips that deliver large or multiple drops increase costs."); ¶ 188 ("From a biopharmaceutical and economic point of view, however, smaller volumes . . . should be instilled."); ¶ 194 ("it has been suggested that the decrease in drop size . . . would reduce the rate of drug loss . . . and, in addition, the cost of therapy."); ¶ 196 (same); and ¶ 200 (same).

Putting aside the fact that some of these articles conflict as to how they arrive at their opinions on costs, the main point to take away from Plaintiffs' allegations based on the articles is that the authors assume — just as Plaintiffs do — that if Defendants replace their bottles with smaller tips, the medications would somehow cost less. The flaw in relying on these opinions is that they do not specifically address or discuss Defendants' pricing model as to the ophthalmic medications at

13

issue. Rather, Plaintiffs and these authors resort to hypothesizing what manufactures would do if tip dispensers were made smaller. Indeed, Plaintiffs concede as much: Plaintiff's theory of pricing is based on "a comparison to a hypothetical world in which Defendants might have produced smaller drops." Am. Compl., ¶ 176. Plaintiffs have not pled any basis for alleging that the way Defendants price their products will take into account the drop sizes. This is the very type of speculative pleading that the Third Circuit has recently cautioned against.

In *Finkelman*, one of the plaintiffs purchased a Super Bowl ticket for an allegedly inflated price on the ticket resale market. *Finkelman*, 810 F.3d at 190-91. As a result, that plaintiff sued the National Football League ("NFL") under New Jersey's Consumer Fraud Act for a refund of the cost in excess of the printed ticket price. *Id.* at 190. Plaintiff's cause of action was premised on the NFL's practice of withholding tickets. In that connection, as to standing, Plaintiff reasoned that such a practice reduced the supply of tickets and inflated ticket resale price, thereby causing him injury.

The Third Circuit, in the context of a motion to dismiss, found that the plaintiff's allegations were not sufficient to meet standing requirements. First, the Third Circuit found that the alleged increased price that the plaintiff paid on the resale market was based on the plaintiff's "basic" assumption that a

"reduction in supply will cause prices to rise." *Id.* at 199 (citations omitted). However, the court explained that there may be other factors that have caused the prices to inflate: "while it *might* be the case that the NFL's withholding increased ticket prices on the resale market, it might also be the case that it had no effect on the resale market." *Id.* at 200. To state the problem succinctly, courts "have no way of knowing whether the NFL's withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market. [Courts] can only speculate – and speculation is not enough to sustain Article III standing." *Id.* The Third Circuit further commented that, although the plaintiff's theory of standing is based on an application of a "basic economic logic," that logic, however, is premised on his supposition. *Id.* at 201. In fact, the Third Circuit concluded that "[i]t [was] pure conjecture about what the ticket resale market might have looked like if the NFL had sold its tickets differently." *Id.*

The Third Circuit's advisement is well taken by this Court. Like their original complaint, Plaintiffs' newly revised pleadings have not offered any facts — other than their speculation — that the pricing of a hypothetical bottle design with smaller dispensing tips would be based on the volume of fluids. And, indeed, just like the type of allegations made by the plaintiff in *Finkelman*, Plaintiffs, here, premise their theory on the "basic principle"

15

that pricing is solely based on volume. The articles that Plaintiffs cite rely on that same principle, and there is no indication in those articles that any of the defendants would manufacture products that dispense fewer eye drops at a less expensive price. Importantly, it appears that all the studies on which Plaintiffs rely examine the medical aspect of the drop volume relating to ophthalmic medicines, not on any economic aspects of how manufacturers of those medicines price their products. Indeed, Plaintiffs have not identified any of these authors to be experts on such economic issues. Thus, while volume may be a pricing factor — just as some of the articles opined — this Court has no way of knowing whether Defendants would price their products in such a way, particularly since the pricing of pharmaceuticals is complex and multi-factored. *Cf. Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 585 (6th Cir. 2013); *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 115 (2011). Therefore, the Court cannot not credit Plaintiffs' bald assertions that Defendants would base the prices of their products on the volume of fluids as the determinative factor, or a factor at all.[4] Indeed, "Article III injuries require

---

[4] Finally, in an effort to support their pricing theory, specifically with respect to defendant Alcon, Plaintiffs included allegations regarding conversations Alcon's expert, Dr. Alan Robin allegedly had with other Alcon marketing executives in the 1990s. Am. Compl., ¶¶ 210-216. While Plaintiffs alleged the same conversations in the original complaint, and the Court rejected as conclusory, Plaintiffs included additional facts that these executives told the expert that Alcon was unwilling to reduce drop

16

a firmer foundation." *Finkelman*, 810 F.3d at 201; *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C. Cir. 2012)(finding that the plaintiffs had no Article III standing when their theory concerning airline tickets required "pil[ing] speculation atop speculation" as to how the tickets would be priced in the future); *Carter v. Alcon Labs, Inc.*, No. 13-997, 2014 U.S. Dist. LEXIS 32381, at *12-13 (E.D. Mo. Mar. 13, 2014)("even if Defendants sold bottles with less medication, Plaintiff has not suggested there is anything to preclude them from charging what they now charge for the bottles currently available for purchase.").[5]

**B.    Reimbursement of Costs**

The reimbursement theory that Plaintiffs propose was previously rejected by this Court.   In the Amended Complaint, Plaintiffs reiterate that they have suffered a concrete injury because they "did not receive the full use and therapeutic benefit of the medication they purchased as a result of Defendants' actions" and that they were compelled "to purchase amounts of

---

size because it would make less money.   *Id.*   As the Court held previously, these allegations do not address "how it would impact Alcon's discretion, much less the discretion of the thirteen other Defendants, in setting the prices of redesigned products." *Cottrell,* 2015 U.S Dist. LEXIS 81830 at *18-19 n.5.   Plaintiffs' additional allegations, again, do not explain how these 20-year old conversations with former executives have any impact on Alcon's discretion now – or any other defendants in this case — to set the prices of certain hypothetically redesigned bottles in the future.
[5]    I cited a plethora of cases in my previous opinion that I found supported my conclusion in this regard.   I will not repeat them here. *See Cottrell*, 2015 U.S. Dist. LEXIS 81830 at *19-20.

medication that were not useful and therefore wasted." Am. Compl., ¶¶ 175-176. In that regard, Plaintiffs claim that they are entitled to receive reimbursement from Defendants for those wasted drops. But, these allegations do not assuage any of the Court's concerns.

First and foremost, Plaintiffs' causes of action sound in fraud. Yet, Plaintiffs do no allege that they were promised by Defendants a specific number of doses or drops and that the consumers failed to receive those amounts. Nor are there any allegations that Plaintiffs were forced to purchase additional prescriptions because the medications were depleted prematurely. Indeed, Plaintiffs do not allege that the eye medications failed to perform as intended such that Plaintiffs did not receive the benefit of their bargain. Moreover, there are no allegations that Plaintiffs were induced by any deception on the part of the defendants to purchase the medications. And, importantly, there are no allegations that any Plaintiffs would have purchased comparable cheaper products that dispense smaller drops, in lieu of Defendants' products.

What I have just outlined above are theories of injuries normally attendant to consumer fraud claims. In fact, I advised Plaintiffs that there are, generally, two theories of economic harm associated with consumer fraud actions: benefit-of-the-bargain and out-of-pocket expenses. The former relates to economic

damages caused by a product failing to perform as advertised, and therefore, the consumer would not have received the benefit of his/her bargain. *See, e.g., Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. Appx. 257, 259 (3d Cir. 2010) ("[a]bsent any allegation that [plaintiff] received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [plaintiff] has not demonstrated a concrete injury-in-fact."). The latter encompasses any expenses that a plaintiff incurred as a result of purchasing the defective product, *e.g.*, replacement costs. *See, e.g., Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012); *Dicuio v. Brother Intern. Corp.*, No. 11-1447, 2012 U.S. Dist. LEXIS 112047, at *7 (D.N.J. Aug. 9, 2012) ("The out-of-pocket rule applies when a plaintiff can demonstrate that he paid money, and is now, out-of-pocket."). I further advised Plaintiffs that they must allege sufficiently to establish a viable economic harm such that they have standing to sue. However, none of the new pleadings asserted by Plaintiffs demonstrate such a harm.

Rather, Plaintiffs' reimbursement theory rests on their disagreement with how Defendants designed their bottles — a design that has been specifically approved by the FDA in a medical context — and their insistence that they should be reimbursed for drops that were wasted as a result of the design, although Plaintiffs were never promised a certain number of doses. This is not

sufficient. Suppose Plaintiffs' claims were based on allegations that the packaging of Defendants' products were excessive such that they had overpaid for the products. Further suppose that if Defendants changed such packaging, consumers would pay less for the medications. Clearly, however, Plaintiffs would not have standing to sue Defendants for consumer fraud based on the packaging allegations because Plaintiffs would have suffered no injuries since no deception by Defendants was made in that regard. In sum, such a hypothetical example and Plaintiffs' reimbursement theory alike, merely rely on an "unsupported conclusion regarding [an] alleged loss." *see Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 541 (D.N.J. 2011).

In conclusion, the Court holds that Plaintiffs have failed to sufficiently allege Article III standing. Therefore, it deprives this Court of subject matter jurisdiction. *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Absent jurisdiction, the Court is without authority to address the parties' remaining merit-based arguments. *See Adams v. Ford Motor Co.*, 653 F.3d 299, 304 (3d Cir. 2010) ("[i]f plaintiffs do not possess Article III standing, both the District Court and this Court lack subject matter jurisdiction to address the merits of plaintiff's case.").

20

**CONCLUSION**

For the reasons set forth above, Defendants' motions to dismiss are **GRANTED** as Plaintiffs lack standing to bring suit. As a result, Plaintiffs' motion for leave to file supplemental exhibits relating to issues involving the merits of this Case is denied as **MOOT**.


DATE:  March 24, 2016                    /s/        Freda L. Wolfson
                                         Freda L. Wolfson
                                         United State District Judge